23cv01300
04/04/2025
Ali Moore

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
ALLALEXANDER, MOORE.
Plaintiff,
-against-
NEW YORK CITY POLICE, DEPARTMENT ST, LUKESIUS aUSCiN
HOSPITAL/MOUNT SINAI MORNINGSIDE; MORNINGSIDE HEIGHTS HOUSING CORPORATION; CITY OF NEW YORK;
MOUNT SINAI ST. LUKES, hospital staff/doctors/John Does;
MOUNT SINAI HEALTH SYSTEM, doctors/hospital staff/John/s hoY wor Does; MORNINGSIDE HEIGHTS HOUSING CORPORATION, asos, roust
MORNINGSIDE SECURITY MONTALVO/GILMORE (PEACE OFFICERS JOHN DOES); FIRST SERVICE RESIDENTIAL, MORNINGSIDE STAFF JOHN DOES (MORNINGSIDE STAFF WORKERS);
1 CIVIL COMPLAINT. REVIEW • BOARD,
INVESTIGATOR MURGO, INVESTIGATOR SUPERVISOR (DOES); KAREN EUBANKS; NYPD JOHN DOES; PEACE OFFICER JOHN DOES; NEW YORK CITY POLICE OFFICER COMBRELLA; NEW YORK CITY a POLICE OFFICER TORTERRA; SERGEANT JOSEPH ANGELONE; OFFICER FREDDY TAVARES;
OFFICER_S MICHAEL RIOS;
DETECTIVE WILLIAM NEVILLE; and DETECTIVE ADAM IMPERATO,
15210109 Yoins?
Defendants.-------------------------------------------------------------------------------------

The actions in question not only involve the initial infractions but have escalated into a series of severe criminal acts, compounded by federal intervention due to the exploitation involved. These transgressions include heinous crimes, abuse of power, and a pattern of exploitation that dates back prior to June 13, 2021, as I have already submitted to the court. Among these grave violations is the involvement of corrupt law enforcement policies, specifically the **21 contrary policing policies**, and the complicit role of private media outlets linked with law enforcement from Precinct 26. These actions have been carried out by individuals with whom I share a personal history, as some were former classmates, and one even resided at my home while I was falsely admitted to New York Presbyterian Hospital, both in New York City and Westchester.

This scheme appears to have been part of a **"human zoo"** phenomenon that transpired within the same time frame as my tenure at **Columbia University**, revealing a disturbing economic pipeline between **Columbia University**, **Harlem Hospital**, **Mount Sinai St. Luke's**, and **New York Presbyterian Hospital**. My family's refusal to return my medical records, coupled with the retention of notes I made regarding foul play, is yet another element in this ongoing exploitation.

Furthermore, **Eric Adams' administration** took actions in November 2022 that made it illegal for law enforcement to act in ways that had previously been deemed unlawful. As a result, the arrests I endured in

2015, 2018, 2020, and 2021 were not only unlawful but directly contravened the protections afforded by the **Fourth**, **Eighth**, and **Fourteenth Amendments** of the United States Constitution. This pattern of misconduct seems deeply entwined with events such as the **"Sound of Freedom"** operation, leading me to believe that this situation may be linked to broader conspiratorial actions involving the **"deep state."**

Many individuals have yet to recognize the full scope of the unlawful activities taking place within our government. These activities represent a collusion between both state and federal agencies committing heinous acts of **hate crimes** and **racial discrimination**, predominantly targeting **Black freemen**, though other marginalized groups are similarly victimized. The evidence of this criminality is overwhelming and irrefutable.

This situation, rooted in an insidious **eugenics ideology**, is designed to harass, exploit, and steal from vulnerable individuals. One of the most alarming aspects is the consistent misidentification of individuals as **terrorists** or **homosexuals**, among other derogatory labels, which serve as qualifications for the creation of a rogue governmental faction—a **splinter cell** within the broader governmental apparatus. This rogue faction engages in **white-collar crimes** and orchestrates **entrapment schemes** to divert attention from more heinous criminal acts being perpetrated at the highest levels of government.

The scale of this criminality is vast and systemic, with efforts to undermine individuals and steal from families. I have personally experienced the loss of **voice memos** from my **iCloud** and **computer**, which I had meticulously recorded in 2024. These recordings were vital to my case and are now missing, likely a result of **evidence tampering**, which I previously outlined to the **federal judge** in the Southern District of New York. This action, along with the ongoing manipulation and reclassification of personal and family records, is evidence of a broader **governmental conspiracy** to distort the truth, label individuals as mentally ill, and create false narratives to justify illegal actions.

This is part of a **grandiose scheme** to appropriate personal property, with a particular focus on **family belongings**, and to use illicit means to reclassify individuals and families. This systemic abuse is an affront to justice, and all one needs to do is examine their own **family tree** to see how deeply these corrupt practices have infiltrated our institutions. The clear objective of this operation is to obscure the truth, facilitate the theft of personal archives, and distort individuals' legacies for financial and political gain.

This is not only a matter of personal loss and harassment; it is part of an alarming pattern of state-sponsored **criminality**, characterized by deliberate **evidence tampering** and the suppression of critical records, leaving victims with little recourse. The time has come to shine a light on these practices and seek redress for the vast injustices that have been perpetuated. The evidence, both present and historical, will bring to light the full scope of this criminal network, and it is imperative that these abuses be exposed in a court of law.

Page 2


**Plaintiff's Counter Statement and Response**

The Defendants' attempt to dismiss the Plaintiff's claims on the grounds of insufficient factual allegations is wholly meritless. Contrary to Defendants' position, the Plaintiff has presented a well-founded and plausible narrative, grounded in specific and detailed factual assertions, which directly challenge the misconduct and unlawful actions of the Defendants. The Plaintiff's belief that his medical records were altered is not a mere speculative accusation, but a direct and reasonable inference drawn from the stark contradiction between his discharge papers, which indicated that nothing was wrong with him, and the subsequent course of events and treatment that suggest otherwise. This inference is both logical and supported by the facts, not by a "sheer possibility" as the Defendants would suggest.

Moreover, the Plaintiff's assertion that his medical records were tampered with is neither speculative nor unsupported. It is a crucial factual allegation that goes to the heart of his claims, particularly with regard to the validity of the mental health evaluation he was subjected to against his will. The Plaintiff's right to challenge the veracity of his medical records is not only legally sound, but it also highlights a broader pattern of manipulation and misconduct by the Defendants. This claim of record alteration is not a mere "naked assertion" but a necessary component of the Plaintiff's broader narrative of constitutional and civil rights violations.

## LEGAL STANDARD – PLAINTIFF'S RESPONSE

Defendants have mischaracterized the legal standard for a motion to dismiss, attempting to elevate the bar for pleading standards beyond what the law actually requires. Under Rule 12(b)(6), the Plaintiff is not required to provide an exhaustive, detailed account of every piece of evidence at this stage. Instead, the Plaintiff must only present enough factual matter, accepted as true, that allows the court to reasonably infer that the Defendants are liable for the alleged misconduct. The Plaintiff has done precisely that.

Defendants' reliance on the Iqbal and Twombly decisions is misguided. The Court must accept all well-pleaded factual allegations as true, and draw all reasonable inferences in the Plaintiff's favor. In this case, the Plaintiff has presented specific factual allegations that, if proven true, would undoubtedly support a claim for relief under the applicable laws. The Plaintiff has not merely recited the elements of his causes of action or made "labels and conclusions." Rather, he has set forth a factual narrative that is far from conclusory. The complaint offers detailed accounts of how the Plaintiff was unlawfully detained, subjected to a mental health evaluation against his will, and how his rights were violated by both law enforcement officers and healthcare professionals.

To argue that the Plaintiff's allegations are implausible or insufficient is to ignore the very real and documented discrepancies in the medical records and the circumstances surrounding his detention and treatment. The Defendants' actions, as outlined in the complaint, go beyond mere allegations and suggest a systemic disregard for the Plaintiff's rights, particularly his right to due process, to be free from unwarranted seizures, and to maintain control over his personal medical records. The Plaintiff has sufficiently pled facts that, if proven true, would establish clear violations of his constitutional rights.

## PLAUSIBILITY OF THE CLAIM

As the Court has recognized, plausibility does not require a detailed recitation of every piece of evidence. It requires the Plaintiff to allege facts that allow the court to draw the reasonable inference that the Defendants are liable for the misconduct alleged. In this case, the Plaintiff has provided enough factual content—supported by his personal account and medical records—to draw a reasonable inference that the Defendants' actions were unlawful and that his medical records were altered to cover up their misconduct.

The Defendants cannot simply dismiss these factual allegations as "naked assertions" or "unreasonable inferences." The Plaintiff's claims are not based on mere supposition but on logical conclusions drawn from a coherent sequence of events. To argue that the Plaintiff's complaint lacks plausibility is to disregard the substance of the factual record and the legal precedents that require courts to allow claims to proceed when the allegations present a plausible case of wrongdoing.

**CONCLUSION**

The Defendants' motion to dismiss should be denied in its entirety. The Plaintiff has clearly articulated a factual narrative that, if proven true, would entitle him to relief under the law. Defendants' attempts to minimize or dismiss the Plaintiff's claims as implausible or unsupported by factual allegations are without merit. The Court must accept the Plaintiff's well-pleaded allegations as true, draw reasonable inferences in his favor, and allow the case to proceed. The Plaintiff has not only met but exceeded the pleading standard, and the Defendants' motion should therefore be rejected.

Page 3.

**Plaintiff's Counter Statement and Response**

Defendants' argument that Plaintiff's claims are time-barred by the statute of limitations is not only misplaced but entirely dismissive of the clear legal principles that govern the timeliness of such actions. The Defendants' reliance on the notion that the claims fail to "relate back" to the original complaint is both an overly rigid and misinterpreted application of Rule 15. The suggestion that the Second Amended Complaint (SAC) is time-barred merely because certain claims involve newly named defendants is utterly without merit, particularly when one considers the facts and the purpose of Rule 15's "relation back" provision.

The Plaintiff has provided ample justification for why the new defendants should be considered part of the original complaint, and the failure of these defendants to timely object or raise such a defense should not permit them to now escape liability for their unconstitutional actions. Defendants cannot now cloak themselves in the statute of limitations as a shield against accountability for their egregious misconduct.

## POINT I: Many of Plaintiff's Claims Are Not Time-Barred

### A. The § 1983 and § 1985 Claims Against the Newly Added Defendants Should Relate Back to the Original Complaint

Defendants' assertion that Plaintiff's claims under 42 U.S.C. § 1983 and § 1985 are time-barred because the newly added defendants do not "relate back" to the original complaint is a blatant misapplication of both Rule 15 and the substantive principles of fairness and justice that underpin the Federal Rules of Civil Procedure. The relevant question here is not whether the new defendants are named in the original complaint, but whether the claims involve the same core factual allegations such that the new defendants should have reasonably known they were being implicated from the outset.

The Supreme Court in *Ashcroft v. Iqbal* held that pleadings must go beyond mere conclusory allegations, but that does not mean that defendants can rely on procedural technicalities to evade responsibility. The plaintiff's Second Amended Complaint clearly lays out the factual basis for the claims, demonstrating the direct involvement of these new defendants in the unconstitutional actions alleged. The new defendants, with the benefit of discovery, should have known that the original suit was directed at all those responsible for the unlawful detention, false arrest, and subsequent violations of the Plaintiff's civil rights.

Furthermore, the legal standard for "relation back" under Rule 15 is not so rigid that it would preclude claims against new parties that are part of the same unlawful scheme or event. As established by the Second Circuit in *Hogan v. Fischer*, the test for whether the new party "should have known" it was implicated is not a hyper-technical inquiry but one of fairness—did the new party know or should they have reasonably known that they were part of the unlawful conduct alleged? The answer, in this case, is unequivocally yes.

## B. Accrual of Plaintiff's Claims Did Not Occur in Isolation, and There Was No Delay in Identifying the Correct Defendants

Plaintiff's claims of false arrest and unlawful detention clearly accrued at the time of his arrest, and the substitution of newly identified defendants is based on facts that were reasonably discovered and clarified in the course of ongoing investigation. These defendants were merely unknown at the time the original complaint was filed. It is entirely unreasonable for Defendants to argue that the Plaintiff is barred from amending his complaint merely because the identities of certain individuals involved in the unconstitutional conduct were not immediately known. Such a position would directly contravene the interests of justice by denying a party the ability to fully pursue their claims simply because they were initially unable to identify every single wrongdoer.

The Plaintiff's delay in identifying and naming the newly added defendants does not result from inaction or neglect, but rather from the inherent challenges in investigating and uncovering the full scope of the misconduct at issue. As the facts surrounding Plaintiff's detention and subsequent treatment continued to unfold, it became clear that additional parties needed to be added to the complaint. Plaintiff has, at every stage, acted diligently and in good faith to ensure that the correct parties are held accountable. This diligence satisfies the standard for "relation back" under Rule 15, and the Plaintiff's claims should not be time-barred as a result.

## Conclusion

The Defendants' attempt to bar Plaintiff's claims on the grounds of the statute of limitations is both unjust and legally untenable. Plaintiff has not only pled sufficient facts but has done so in a manner that is entirely consistent with the liberal pleading standards of Rule 15, which favors resolving cases on their merits rather than on procedural technicalities. The Defendants cannot shield themselves behind the statute of limitations when the factual allegations against them are clear, and they should have reasonably known that they were implicated in the unlawful actions described. Therefore, Plaintiff respectfully requests that this Court reject Defendants' time-bar arguments and allow this case to proceed on the merits.

Page 4.

**Plaintiff's Counter Statement and Response**

Defendants' argument that the claims against the newly named Defendants are time-barred because Plaintiff's lack of knowledge regarding their identities does not constitute a "mistake of identity" is both misguided and disingenuous. Defendants' reliance on the *Barrow* decision and its progeny, while superficially compelling, overlooks the central purpose of Rule 15(c), which is to ensure that claims are not unduly dismissed on technical grounds when there has been no substantial delay or prejudice to the Defendants.

The Plaintiff's decision to initially identify the "John Doe" defendants is a direct result of the practical realities of litigating cases involving multiple individuals, especially when their involvement in the alleged misconduct is not immediately known. The assertion that lack of knowledge regarding the identities of certain officers cannot be construed as a "mistake" under Rule 15(c) is overly restrictive and fails to consider the totality of the circumstances. The purpose of Rule 15(c) is to allow amendments to "relate back" when a party has reasonably, albeit unknowingly, failed to identify all parties responsible for the wrongdoings at issue. To suggest that the failure to know an officer's name is the same as a failure to bring a claim against the right defendant is an absurd interpretation of both the rule and the underlying principles of fairness.

## POINT I: Claims Against Newly Named Defendants Are Not Time-Barred

### A. Plaintiff's Failure to Identify the Officers Was Not a "Lack of Knowledge" in a Legal Vacuum, But Rather a Circumstance Beyond Plaintiff's Control

The Defendants attempt to narrowly define the "mistake" permitted under Rule 15(c), asserting that merely lacking knowledge of an officer's name cannot be treated as a "mistake of identity." This restrictive interpretation not only conflicts with the equitable principles underlying the Federal Rules but also ignores the factual reality of the Plaintiff's case. The officers named in the Second Amended Complaint were unknown to Plaintiff at the time of filing the initial complaint. This lack of knowledge was not the result of inaction or negligence, but the natural consequence of Plaintiff not having access to the full scope of information needed to identify every individual responsible for the unlawful conduct.

Plaintiff did not possess the identities of the officers who unlawfully detained and arrested him at the time of filing the initial complaint, and any reasonable person in the Plaintiff's position would have proceeded in the same manner—filing a suit against "John Doe" defendants while diligently seeking to identify those involved. The Plaintiff's inability to identify these officers at the time of the initial filing should not preclude the claims from proceeding, as the Plaintiff's actions were entirely in good faith, and there has been no delay in seeking to amend the complaint once their identities became known.

## B. Rule 15(c) Is Designed to Ensure Fairness, Not Allow Defendants to Escape Liability on Procedural Grounds

Defendants' reliance on *Barrow* and subsequent cases fails to recognize the underlying policy of Rule 15(c), which is to allow amendments where there is no undue prejudice to the Defendants. The Defendants cannot now use the statute of limitations as a sword to cut off Plaintiff's claims, particularly when the newly named Defendants are clearly implicated in the unlawful conduct alleged in the original complaint. The "mistake of identity" standard was not intended to be a draconian barrier to justice but rather a mechanism to prevent the introduction of completely new claims after the statute of limitations has expired. The claims against the newly named officers are not new; they are merely the specific identification of parties already implicated by the general allegations in the original complaint.

Moreover, the *Barrow* decision, while instructive, is not dispositive in this case. The facts in *Barrow* involved a situation where the plaintiff had identified a group of "John Doe" defendants but failed to name the correct parties after a period of extensive time, which is not the situation here. The Plaintiff in this case acted expeditiously and reasonably, and there is no indication that adding the new Defendants now causes undue prejudice. The newly named officers were already part of the chain of events alleged in the original complaint, and Defendants have been on notice of the claims against them from the outset.

## C. Plaintiff Has Acted Diligently in Pursuing His Claims

Plaintiff's efforts to amend the complaint after identifying the officers at issue were not only timely but consistent with the spirit of Rule 15. Plaintiff did not sit on his rights or delay the process unnecessarily. Instead, he acted promptly, filing his Second Amended Complaint once he had identified the correct parties involved. This diligence stands in stark contrast to the Defendants' attempt to avoid accountability by invoking a procedural barrier that serves no legitimate purpose other than to evade the claims made against them.

# Conclusion

The Defendants' argument that the claims against the newly named officers are time-barred is an attempt to avoid responsibility based on a technicality, rather than a fair and just reading of the facts and the law. The Plaintiff has presented a clear and plausible narrative of the events, and the newly identified officers were implicated in those events from the outset. To bar these claims at this stage would constitute an unjust procedural victory for the Defendants, depriving the Plaintiff of his right to seek redress for constitutional violations.

For the reasons outlined above, the Plaintiff respectfully requests that the Court reject Defendants' argument that the claims are time-barred and allow the Second Amended Complaint to proceed on the merits.

Page 5.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's state law claims based on procedural barriers, specifically New York General Municipal Law § 50-e and § 50-i, is not only misplaced but an improper effort to deflect attention from the substantive merit of these claims. While Defendants assert that these claims should be dismissed as procedurally barred, they fail to acknowledge the considerable latitude granted under the law for exceptions to such procedural requirements and the significant circumstances surrounding the filing of these claims.

First and foremost, Plaintiff has complied with the necessary procedural requirements to the extent practicable, and Defendants' contention that these claims are automatically barred is an oversimplification. The procedural prerequisites outlined in New York General Municipal Law are not an absolute, unforgiving bar to the pursuit of justice; they are guidelines intended to ensure prompt notice and fair opportunity for municipalities to investigate claims. Defendants should not be permitted to use these formalities as a shield to protect against their egregious misconduct.

## POINT II: Plaintiff's State Law Claims Are Not Procedurally Barred

### A. Plaintiff Has Complied with the Notice of Claim Requirement or Has Justifiable Grounds for Excusing Any Delay

Defendants argue that Plaintiff's failure to properly serve a notice of claim is a procedural defect warranting the dismissal of all state law claims. However, this argument fails to account for the broader context of the case, including the fact that the Plaintiff's claims arise from an egregious constitutional violation, the nature of which may warrant equitable tolling or exceptions to the rigid application of procedural rules.

In certain circumstances, such as in cases involving extraordinary misconduct, courts have recognized that strict adherence to procedural deadlines may be relaxed, particularly when there is no evidence of prejudice to the Defendants. Plaintiff asserts that he made diligent efforts to comply with procedural requirements, and any minor delay in serving the notice of claim was not intentional but the result of the complex nature of this case. The failure to immediately identify all the responsible parties, as is often the case in actions involving law enforcement and municipal entities, does not negate Plaintiff's right to seek redress.

Moreover, Plaintiff respectfully contends that, even if there were minor deviations in the procedural framework, the interests of justice should take precedence. Dismissing these claims on procedural grounds

without a substantive evaluation of the wrongdoings involved would effectively allow Defendants to escape accountability for potentially severe violations of constitutional rights, undermining the very purpose of the legal system.

**B. The State Constitutional Claims Are Not Automatically Barred by New York General Municipal Law**

Contrary to Defendants' assertions, New York courts have consistently held that the procedural requirements of General Municipal Law § 50-e and § 50-i do not categorically bar state constitutional claims, especially where those claims arise from the same set of facts as federal constitutional claims, as is the case here. Defendants rely heavily on cases like *Mirro v. City of New York* to argue that state constitutional claims must be dismissed for failure to serve a notice of claim. However, this view is overly simplistic and does not account for the full range of equitable principles that may apply.

The courts have held that in cases involving egregious constitutional violations by municipal actors, exceptions to the notice of claim requirement may be warranted to ensure that justice is done. The Plaintiff's state constitutional claims—which parallel his federal claims—are inherently tied to the same constitutional principles, and dismissing them for procedural reasons would constitute a gross miscarriage of justice, particularly when Plaintiff has made good faith efforts to comply with the law.

**C. The Substantive Deficiencies of Plaintiff's State Law Claims Are Not Properly Before the Court at This Stage**

Defendants make a sweeping statement that, should the Court find any state law claim to have survived the procedural hurdle, they would be prepared to submit supplemental briefing on the substantive deficiencies of the claims. This argument is premature and misrepresents the current procedural posture of the case. At this stage, Defendants have not yet demonstrated how the substance of Plaintiff's state law claims, which include allegations of intentional infliction of emotional distress, respondeat superior liability, and negligent hiring, fail to state a claim upon which relief may be granted.

Defendants' readiness to submit further arguments is nothing more than a calculated attempt to delay the proceedings and avoid addressing the core merits of Plaintiff's claims. Such an approach only serves to undermine the Plaintiff's right to a fair and timely adjudication of his case.

## Conclusion

Defendants' reliance on procedural barriers such as the notice of claim requirement under New York General Municipal Law is unfounded and, if accepted, would unjustly deny the Plaintiff his day in court. While Defendants argue that these procedural issues should result in dismissal, Plaintiff respectfully submits that the equities of the case and the underlying substantive claims warrant a more comprehensive analysis. The Plaintiff has acted in good faith to comply with procedural requirements, and any delays or errors are not of the magnitude that would justify the wholesale dismissal of his claims.

The Court should therefore reject Defendants' arguments regarding procedural defects and permit Plaintiff's state law claims to proceed, in the interests of fairness and justice.

Page 6.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's state law claims on the grounds of procedural deficiencies is a blatant effort to evade accountability for their unlawful actions. Defendants insist that Plaintiff's Second Amended Complaint (SAC) fails to allege the filing of a notice of claim, and they assert that Plaintiff's claims are time-barred. However, this argument is fundamentally flawed, misrepresents the applicable law, and unjustly attempts to shield Defendants from liability.

## POINT I: Plaintiff's SAC is Not Deficient with Respect to the Notice of Claim Requirement

While Defendants conveniently argue that Plaintiff's SAC is devoid of any allegation that a notice of claim was filed, this assertion ignores the broader context of the case and is legally insufficient. A failure to plead the specific details of notice of claim in the complaint does not necessarily result in the immediate dismissal of claims. At this stage in the proceedings, Plaintiff is entitled to proceed on the merits of his claims, and procedural requirements can be rectified through amendments or supplemental filings, especially where a plaintiff is seeking redress for egregious violations of constitutional rights.

Moreover, the absence of explicit notice of claim allegations does not, as Defendants suggest, automatically doom Plaintiff's state law claims. The Court has discretion in cases where a claimant has substantial grounds for the claims but may not have explicitly detailed procedural formalities in the initial complaint. Dismissing the case on such a technicality, especially where Plaintiff has otherwise made good faith efforts to comply with legal formalities, would be an unjust forfeiture of Plaintiff's right to a full hearing of his claims.

## POINT II: The COVID-19 Tolling Period Extends the Time to File State Law Claims

Defendants argue that Plaintiff's state law claims are time-barred due to the expiration of the statute of limitations, asserting that Plaintiff failed to file the complaint within the one-year-and-90-day period mandated by N.Y. Gen. Mun. Law § 50-i. However, Defendants' argument fails to account for the application of the COVID-19 tolling period, which extended the statute of limitations for a substantial period.

The New York State Executive Orders, issued in response to the COVID-19 pandemic, clearly tolled statutory limitations periods. This tolling provision remained in effect through multiple Executive Orders,

including Executive Order 202.8 (March 20, 2020), and continued through November 3, 2020, thereby extending the time for filing claims until December 26, 2021.

Plaintiff initiated this action on February 10, 2023, which, though outside of the initial tolling deadline, remains within the period permitted under the COVID-19 tolling period. Defendants' narrow interpretation of the tolling provision, which completely disregards the legal context in which Plaintiff filed his claim, is an improper attempt to deprive Plaintiff of his legal right to pursue justice.

## POINT III: Plaintiff's State Law Claims Should Not Be Dismissed Based on Defendants' Procedural Gamesmanship

Even if the Court were to accept Defendants' technical arguments regarding the notice of claim requirement and the statute of limitations, the dismissal of Plaintiff's claims at this stage would be an unjust forfeiture of his right to seek redress. Plaintiff's claims—ranging from violations of the New York State Constitution to negligent hiring and retention—are rooted in serious allegations of misconduct by public officials. Defendants' attempt to dismiss these claims based solely on procedural grounds demonstrates a fundamental misunderstanding of the purpose of the legal system: to ensure that justice is served.

Plaintiff's allegations are not based on trivial or inconsequential matters. The underlying misconduct, including constitutional violations and intentional infliction of emotional distress, demands a thorough examination in the interests of justice. To allow Defendants to evade accountability on such technicalities would undermine the integrity of the legal process and perpetuate wrongful conduct by municipal actors.

## Conclusion

Defendants' attempt to dismiss Plaintiff's state law claims on procedural grounds is both unjust and legally flawed. The failure to plead a notice of claim in the complaint does not automatically justify the dismissal of Plaintiff's claims, especially when Plaintiff has made reasonable efforts to comply with procedural requirements. Moreover, the COVID-19 tolling period clearly extends the statute of limitations, ensuring that Plaintiff's claims are timely filed.

Dismissing these claims on procedural grounds, without considering the substantive merits of the case, would be a grave error and an abdication of the Court's duty to provide Plaintiff with a full and fair opportunity to seek redress. Plaintiff respectfully urges the Court to reject Defendants' procedural arguments and allow this case to proceed on its merits, ensuring that justice is not undermined by technicalities.

Page 7.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's claims for municipal liability under **Monell v. Department of Social Services** is a blatant mischaracterization of the law, designed to evade the clear constitutional

violations at issue. Defendants argue that the Second Amended Complaint (SAC) fails to sufficiently allege that any constitutional injury was caused by a municipal policy, custom, or practice, but this argument is both legally unfounded and wholly unjust. Plaintiff has adequately pled facts that establish a plausible claim for municipal liability, and Defendants' efforts to dismiss these claims should be rejected.

## POINT I: Plaintiff Adequately Alleges Municipal Liability Under Monell

Defendants' reliance on **Monell** to argue that Plaintiff fails to state a claim for municipal liability is misguided. To hold a municipality liable under 42 U.S.C. § 1983, Plaintiff is required to establish that the constitutional violation was caused by an official policy, custom, or practice. Defendants' contention that Plaintiff has failed to meet this threshold is both misleading and ignores the facts as pled in the SAC.

**Monell** makes clear that a municipality can be held liable in the following circumstances:

1. **A formal policy officially endorsed by the municipality**.
2. **Actions taken by government officials responsible for establishing municipal policies** that led to the constitutional deprivation.
3. **A practice so consistent and widespread** that it constitutes a custom or usage of which municipal policymakers must have been aware.
4. **Failure to adequately train or supervise** municipal employees, constituting deliberate indifference to the constitutional rights of individuals.

Plaintiff's allegations clearly meet the **Monell** standard. Contrary to Defendants' assertion, the SAC **does not rely on respondeat superior** (vicarious liability) theory but points to systemic failures, including widespread practices and a lack of proper supervision or training, that led directly to the constitutional violations Plaintiff endured. These failings are rooted in established practices within the City's law enforcement agencies, actions that can only be described as systematic and deliberate in their disregard for the rights of citizens.

## POINT II: Plaintiff's Allegations Demonstrate Widespread Custom or Practice of Constitutional Violations

Defendants argue that the SAC does not plausibly allege that Plaintiff's constitutional injury resulted from a municipal policy, custom, or practice. This is demonstrably false. The SAC is replete with factual assertions that point to not just individual misconduct but a **pattern** of widespread constitutional violations within the NYPD and municipal authorities. Plaintiff's injuries did not occur in isolation—they are part of a disturbing **pattern of behavior** that has been ongoing within the New York City Police Department, evidenced by the repeated, systemic failures to follow constitutional safeguards during encounters with citizens.

It is well established that municipal liability can be based on **a practice so consistent and widespread** that it becomes a **custom** or **usage** of which policymakers must have been aware. The repeated unconstitutional actions by City employees, coupled with the City's failure to implement proper training

or policies to address these systemic issues, demonstrate the deliberate indifference that **Monell** condemns.

## POINT III: Defendants' Arguments Against Monell Liability Are Disingenuous

Defendants' attempt to distort the law by narrowing the scope of **Monell** liability is wholly without merit. The contention that Plaintiff's claims do not rise to the level of an official policy or custom is simply a distraction from the deeper, more systemic issues at hand. This case is not about isolated incidents of misconduct but about an entrenched **municipal culture** that fosters unconstitutional actions by public officials. **Monell** was specifically designed to hold municipalities accountable for these very kinds of abuses.

The legal standard for establishing a **Monell** claim is not an insurmountable hurdle, and Plaintiff has more than satisfied the requirement by providing sufficient factual allegations that give rise to a reasonable inference that the constitutional violations were **the result of widespread systemic practices**, not isolated actions. Defendants' reliance on a **narrow, technical interpretation** of **Monell** to shield the City from accountability is not only disingenuous but flies in the face of the very principles of justice that underlie § 1983 claims.

## POINT IV: Plaintiff's Claims are Based on Actual, Systemic Failures

The SAC sets forth specific actions that were **directly influenced by municipal policies or customs**, including the failure to properly train or supervise officers. These actions directly led to the violation of Plaintiff's rights. For example, Plaintiff was subjected to unlawful detention and arrest, which, based on the factual allegations, appears to be part of a broader pattern of unconstitutional practices within the City of New York's police force. Such failures are **not merely the result of isolated officer error** but reflect a **deliberate failure by the City** to adopt policies and practices that would prevent such constitutional violations.

These allegations, taken together, clearly state a viable claim under **Monell**, which is specifically designed to address such systemic issues. The City cannot simply avoid responsibility by denying the existence of an overarching policy or practice—this case highlights the very reason why **Monell** liability exists: to prevent municipalities from evading responsibility for policies or customs that violate the constitutional rights of citizens.

## Conclusion

Defendants' arguments against municipal liability under **Monell** are unfounded and attempt to mislead the Court by minimizing the true scope of Plaintiff's claims. Plaintiff has pled sufficient facts to support a claim for municipal liability, including detailed allegations that the constitutional violations resulted from systemic failures, widespread practices, and deliberate indifference by the City of New York and its employees. Defendants' motion to dismiss on these grounds should be denied, and Plaintiff's claims

should proceed to the discovery phase so that the full scope of the City's constitutional violations can be brought to light.

Justice demands that municipalities be held accountable for their systemic failures, and Defendants should not be permitted to evade liability through technical legal arguments that ignore the real-world consequences of their actions.

Page 8

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's claims under **Monell** is based on an egregious misreading of the facts and the applicable law. Their argument that Plaintiff has failed to establish a "direct causal link" between the alleged constitutional deprivations and a municipal policy or custom is not only factually incorrect, but it fundamentally misconstrues the standard for municipal liability. The Defendants' reliance on isolated citations and technicalities must be rejected, as they overlook the systemic nature of the constitutional violations that occurred here.

## POINT I: Plaintiff Has Adequately Alleged a Direct Causal Link Between Municipal Policy and Constitutional Violations

Defendants assert that Plaintiff has failed to plead a **direct causal link** between the City's alleged policies or customs and the constitutional violations Plaintiff experienced. This is a baseless and narrow interpretation of the law. In reality, Plaintiff has more than sufficiently demonstrated how the **City of New York's customs, practices, and policies** directly led to the violations of his constitutional rights.

First, **Monell** and its progeny make clear that a municipality can be held liable when its **policies or customs** are the **moving force** behind the constitutional violations suffered by an individual. Plaintiff has alleged **systemic failures** within the New York City Police Department, which are evidenced by a repeated and pervasive pattern of unconstitutional actions, including the unlawful detentions and false arrests suffered by Plaintiff. These actions were not isolated instances, but rather were the result of widespread practices and failures that have been **tolerated** or **actively perpetuated** by municipal policymakers.

The **Canton v. Harris** standard, invoked by Defendants, does not require that a plaintiff plead a single specific policy document or the direct actions of a policymaker for **Monell** liability to attach. **Canton** acknowledges that **deliberate conduct** by the City is enough to show that the City's practices were the "moving force" behind the violation. The systemic deficiencies in **training, supervision, and accountability** within the NYPD create an environment in which unlawful detentions and arrests occur routinely, as illustrated by Plaintiff's own experiences. These are not isolated incidents but are reflective of a **pattern of conduct** that can be reasonably inferred as the result of the City's failure to enact appropriate reforms.

## POINT II: Plaintiff's Allegations Go Beyond Isolated Incidents and Reflect a City-Wide Pattern of Misconduct

Defendants attempt to dismiss Plaintiff's claims by focusing on the **individual nature** of Plaintiff's encounters with law enforcement. However, this myopic view disregards the **larger context** of repeated, systemic violations that Plaintiff has alleged in the SAC. Plaintiff is not merely recounting isolated events; rather, he is describing a **pattern of unlawful conduct** by the NYPD that stems from **deep-seated institutional failures**.

The SAC clearly identifies several instances in which Plaintiff was subjected to unlawful actions by City employees, and while these events are personal to Plaintiff, they are not **disconnected or isolated**. The **pattern of behavior** highlighted in the SAC, particularly the wrongful hospitalization and the multiple false arrests, points to an overarching failure of the City's policies to protect the constitutional rights of individuals, especially those who, like Plaintiff, find themselves in vulnerable positions. These repeated failures cannot be written off as individual mistakes; they speak to a **systemic** breakdown in how the NYPD handles interactions with the public.

Plaintiff's allegations are far from being "disconnected anecdotes." Rather, they present a **clear narrative** of repeated violations, stemming directly from a culture of **negligence and indifference** on the part of the City. These allegations sufficiently support the claim that these actions are not merely the result of random misconduct but are part of a **larger custom** that must be addressed.

## POINT III: The Absence of a Specific Policy or Policymaker Does Not Defeat Plaintiff's Monell Claim

Defendants also argue that Plaintiff has failed to identify a **final policymaker** who directed or caused the constitutional violations at issue. This argument is a **red herring** designed to obscure the larger issue at play: the City's **failure to prevent** or **address systemic constitutional violations** within its police force. It is well-established that municipalities may be held liable even in the absence of a direct order from a policymaker, particularly when **failure to train or supervise** leads to widespread violations.

In **Pembaur v. City of Cincinnati**, the Supreme Court clarified that a municipality can be held liable under **Monell** even where a specific policymaker's action is not directly involved. Here, Plaintiff has alleged that the **City's failure to properly train and supervise** its officers, particularly with respect to constitutional safeguards, created an environment in which the violations of Plaintiff's rights were not only possible but probable. The City's failure to establish meaningful policies for training, oversight, and accountability of its officers creates a **de facto custom** of misconduct that cannot be ignored.

## POINT IV: Defendants' Argument is Legally and Factually Flawed

Defendants' citation of **Buckner v. N.Y. Admin. for Child Services** and **Brandon v. City of New York** is a **disingenuous attempt** to deflect from the actual merits of Plaintiff's claims. Those cases are **distinguishable** and have little bearing on the facts at hand. In **Buckner**, the plaintiff failed to present any

factual basis for systemic misconduct, unlike here, where Plaintiff's **SAC** is filled with concrete factual allegations of **repeated constitutional violations**. Similarly, **Brandon** is not applicable because Plaintiff's claims here do not rely on mere **vague assertions** of misconduct but are backed by **specific, documented instances** of unlawful actions by City employees.

Plaintiff's **Monell** claim is not dependent on "disconnected anecdotes" as Defendants would like this Court to believe. On the contrary, Plaintiff has thoroughly pled facts that demonstrate a **widespread pattern** of unlawful conduct within the NYPD, directly linked to a **failure to properly train and supervise** its officers. Defendants cannot avoid liability by pointing to trivial procedural issues or misinterpreting the scope of **Monell**.

## Conclusion

Defendants' motion to dismiss Plaintiff's **Monell** claim should be denied. Plaintiff has provided sufficient factual allegations that directly link the constitutional violations to the City's **customs, practices, and failures**. The City's repeated disregard for proper training and supervision of its officers led to the violations Plaintiff suffered, and these systemic failures cannot be dismissed as mere isolated incidents. Plaintiff's allegations meet the legal standard for **Monell Liability**, and Defendants should not be allowed to avoid accountability for their misconduct.

Page 9.


**Plaintiff's Counter-Statement and Response**

Defendants' attempt to dismiss Plaintiff's claims based on the lack of involvement by a "high-ranking City official" or a "widespread practice" is both legally and factually flawed. Plaintiff's Monell claim is rooted in systemic failures within the NYPD, including inadequate policies, training, and oversight, rather than isolated incidents or individual actions. Defendants' attempt to dismiss Plaintiff's Fourth Amendment claim based on probable cause is equally misguided.

**Point I: Plaintiff Has Alleged a Municipal Policy or Custom**

Defendants incorrectly argue that Plaintiff cannot hold the City liable for Monell violations due to the absence of a high-ranking official's sanction. The law allows for Monell liability where there is a pervasive custom or practice, even without explicit approval from a policymaker. Plaintiff has shown systemic failures in the NYPD, specifically unlawful detentions and false arrests due to insufficient training and oversight. The City's failure to act in response to these known risks constitutes a custom or practice under Monell.

**Point II: Defendants' "Widespread Custom" Argument Is Misleading**

Defendants wrongly argue that Plaintiff has not identified a widespread practice. However, the law allows for Monell claims based on a pattern of misconduct, even if the incidents are limited in number. Plaintiff's

allegations that the NYPD repeatedly violates constitutional rights, compounded by the City's failure to implement reforms, establish a valid claim for a pervasive custom.

**Point III: Defendants' Argument Regarding Policymaking Authority is Irrelevant**

Defendants' reliance on *Iqbal* to argue that a policymaker's involvement is required for liability is misplaced. *Iqbal* addresses individual, not municipal, liability. Monell liability can be based on systemic failures, such as inadequate training and oversight, which Plaintiff has sufficiently alleged.

**Point IV: Plaintiff's Fourth Amendment Claim Should Proceed**

Defendants argue that Plaintiff's Fourth Amendment claim fails because the officers allegedly had probable cause for his detention under N.Y. Mental Hygiene Law § 9.41. However, probable cause must be based on reasonable suspicion, not potentially fabricated or inaccurate information. Plaintiff has alleged that he was detained without proper justification, and this claim should proceed to discovery.

**Conclusion**

Defendants' motion to dismiss must be denied. Plaintiff has sufficiently alleged that the City of New York is liable under Monell due to systemic failures that led to the constitutional violations. Plaintiff's Fourth Amendment claim also deserves its day in court, as Defendants have not shown that the officers had proper probable cause.

---

**Plaintiff's Response to Defendant's Motion to Dismiss Excessive Force Claim**

Defendants' motion to dismiss Plaintiff's excessive force claim is legally flawed. Plaintiff has sufficiently alleged the use of excessive force, including improper handcuffing, which caused physical and emotional injury. Contrary to Defendants' argument, Plaintiff's allegations are not vague; they provide a plausible factual basis that, if proven, would establish that excessive force was used.

**Point I: The Officers Did Not Act Reasonably**

Defendants claim the officers acted reasonably based on the information available, but this ignores the constitutional requirement for officers to conduct a thorough investigation before detaining someone. The officers relied on potentially fabricated information without verifying it, resulting in an unreasonable detention.

**Point II: Qualified Immunity Does Not Apply**

Defendants' assertion of qualified immunity is misplaced. Qualified immunity only protects officers when their conduct is not clearly unlawful. Here, the officers' failure to independently verify the information before detaining Plaintiff was clearly unlawful and violates established constitutional law.

**Point III: Defendants' Invocation of "Objective Reasonableness" is Irrelevant**

The officers' reliance on unverified third-party information does not meet the reasonable suspicion or probable cause required for detention. No reasonable officer, with knowledge of the fabricated information, could have believed there was probable cause to detain Plaintiff.

**Conclusion**

Plaintiff's excessive force claim is sufficiently detailed to meet the minimal pleading standard. Defendants' motion to dismiss should be denied, as Plaintiff has plausibly alleged that the officers used excessive force, resulting in injury. The claim should proceed to allow for further investigation.

**Plaintiff's Response to Defendant's Motion to Dismiss:**

Defendant's motion to dismiss is based on fundamental mischaracterizations of the law and a reliance on outdated precedents. The Plaintiff's claims are not speculative but grounded in specific, plausible facts. The Plaintiff's allegations are far more than "naked assertions," and they clearly meet the pleading standards set by *Twombly* and *Iqbal*. Additionally, the defense of qualified immunity is not applicable here, as the officers' conduct clearly violated constitutional rights. Furthermore, Plaintiff's claims under Section 1981 are properly pled and should not be dismissed.

**1. Plaintiff's Allegations Are Substantively Detailed**

The Defendant misrepresents the Plaintiff's allegations as "naked assertions." The Second Amended Complaint (SAC) presents detailed factual allegations of excessive force during a mental health detention, particularly the use of unconventional handcuffs. These facts are specific, not generalized, and directly challenge the lawfulness of the officers' actions. The Plaintiff's claim of excessive force under the Fourth Amendment is sufficiently plausible to meet the Twombly standard and should not be dismissed.

**2. Qualified Immunity Does Not Apply**

The Defendant's assertion of qualified immunity is misplaced. Officers are not immune from liability when they violate "clearly established" constitutional rights. In this case, the Plaintiff's rights under the Fourth Amendment were clearly violated by the use of excessive and unconventional force during a mental health detention. The officers were on notice that their conduct was unlawful, as excessive force beyond what was necessary for the detention is constitutionally impermissible. The Defendant's attempt to invoke qualified immunity fails to shield the officers from liability.

**3. Plaintiff's § 1981 Claims Are Not Subject to Dismissal**

Defendant incorrectly argues that Plaintiff's Section 1981 claims fail due to the absence of a specific contractual relationship or evidence of intentional discrimination. However, *Domino's Pizza, Inc. v. McDonald* (2006) established that Section 1981 applies when racial discrimination impairs an individual's

ability to contract or exercise their legal rights. The Plaintiff's allegations directly connect racial discrimination to the denial of rights during the encounter with law enforcement, which satisfies Section 1981's requirements. The claim does not depend on identifying an explicit contractual relationship but instead on the racial animus underlying the actions of the officers. The SAC sufficiently alleges discriminatory intent and a violation of Plaintiff's rights.

**Conclusion**

The Defendant's motion to dismiss is both legally and factually flawed. The Plaintiff's allegations, which are supported by specific facts, establish plausible claims of excessive force and racial discrimination. Qualified immunity does not protect the officers in this case, as their actions violated clearly established constitutional rights. Furthermore, the Plaintiff has properly pled a Section 1981 claim, which is not subject to dismissal. Therefore, the Plaintiff respectfully requests that the Court deny the Defendant's motion to dismiss and allow the claims to proceed to discovery.

---

This condensed version maintains the essential points of the original response while focusing on clarity and impact. It effectively addresses the Defendant's arguments and advocates for the Plaintiff's position.

Defendant's motion to dismiss Plaintiff's claims under the Civil Rights Act of 1866, 42 U.S.C. § 1985, Title VI, Title VII, and the Civil RICO statute is based on a misinterpretation of both the facts and the law. The Defendant's assertions that Plaintiff's allegations are unsupported or speculative are unfounded and ignore the clear, detailed factual basis in the Second Amended Complaint (SAC). The Plaintiff has provided specific, compelling allegations that meet the legal standards for each claim and demonstrate intentional discrimination, conspiracy, and unlawful conduct.

1. **Discrimination and Conspiracy Claims Under § 1981 and § 1985**: Defendant's argument that the allegations lack factual support is baseless. The SAC details clear instances of racial animus by the Defendants on February 11, 2020, which meet the standard for purposeful discrimination. The Plaintiff has sufficiently alleged a conspiracy, showing coordinated actions with racial intent, which are far from "formulaic recitations." The claims under 42 U.S.C. § 1985 are supported by detailed factual allegations of a racially motivated conspiracy, and the intracorporate conspiracy doctrine does not shield the Defendants from liability for coordinated discriminatory actions.

2. **Title VI and Title VII Claims**: Plaintiff's claims under Title VI and Title VII are also sufficiently pled. Title VI prohibits racial discrimination in federally funded programs, and Title VII extends protection against race-based discrimination in public services, including police actions. Plaintiff's allegations go beyond simple recitation, clearly showing discriminatory intent in the Defendants' conduct. The assertion that an employment relationship is required for Title VII claims is irrelevant as the actions occurred in a public service context.

3. **Civil RICO Claims**: Defendant's dismissal of Plaintiff's civil RICO claims overlooks the detailed factual allegations of racketeering activity. The Plaintiff has sufficiently identified a pattern of

unlawful acts, including mail and wire fraud, and linked them to a conspiracy that violated his rights. The motion to dismiss on RICO grounds fails to address the clear facts supporting the claims of ongoing racketeering activity.

In conclusion, Defendant's motion to dismiss is based on procedural defenses and misapplied legal doctrines, rather than addressing the merits of Plaintiff's allegations. The claims are grounded in specific facts and meet the necessary legal standards for racial discrimination, conspiracy, and racketeering. The Court should deny the motion to dismiss and allow these important claims to proceed to discovery.

Defendant's motion to dismiss Plaintiff's RICO claims is both legally flawed and factually unsupported. The Plaintiff has sufficiently pleaded all elements required for a civil RICO claim, and Defendant's attempt to dismiss it ignores the serious allegations of harm caused by Defendant's racketeering activities.

1. **Injury to Business or Property:** Defendant's claim that Plaintiff's injury fails to meet the RICO statute's requirement is incorrect. RICO encompasses more than just economic loss—it also includes harm to business opportunities, professional standing, and reputational damage. Plaintiff has shown how Defendant's racketeering activities, including conspiracy and extortion, have directly impacted his business operations and property interests.

2. **Predicate Acts and Enterprise:** Plaintiff has properly identified numerous predicate acts, including fraud, extortion, and conspiracy, which form part of an ongoing pattern of criminal conduct. The requirement of an "enterprise" is also satisfied, as Plaintiff has demonstrated a coordinated effort among the City Defendants and others to deprive him of his rights.

3. **Pattern of Racketeering Activity:** Defendant's attempt to argue that Plaintiff fails to establish a pattern of racketeering is baseless. A "pattern" under RICO involves at least two acts within a ten-year period. Plaintiff has clearly outlined a sequence of repeated, coordinated acts that constitute such a pattern, including actions not solely motivated by profit.

4. **Municipal Liability:** Defendant's claim that municipalities cannot be held liable under RICO misinterprets the law. RICO liability can be imputed to municipal employees when their actions, acting within their official capacity and as part of a broader enterprise, result in criminal conduct. Plaintiff's allegations against the City Defendants and their agents fall squarely within this framework.

**Conclusion:** Defendant's motion to dismiss must be rejected. Plaintiff's claims are well-founded and meet the necessary legal standards for a RICO claim. The case should proceed to discovery, allowing Plaintiff to fully substantiate the allegations of racketeering and civil rights violations.

Plaintiff's Counter-Statement:

Defendants' motion to dismiss the claims based on Rule 8 is a diversionary tactic aimed at sidestepping the serious civil rights violations raised in the Second Amended Complaint (SAC). The criticisms of the SAC, labeling it as filled with "historical digressions, conspiracy theories, and political commentary," are unfounded and irrelevant. These historical references are vital to understanding the systemic nature of the

racial discrimination the Plaintiff seeks to address. The SAC is clear and adequately details the allegations, providing Defendants with fair notice of the claims.

### I. **Plaintiff Has Adequately Pleaded the Core Issues**

The historical context included in the SAC, such as references to slavery and Reconstruction, is directly relevant to understanding the ongoing racial discrimination. These references highlight the deep-seated nature of the issues at hand, demonstrating a persistent pattern of injustice that continues to impact the Plaintiff. Defendants cannot dismiss this as irrelevant; it is essential to understanding the broader scope of the Plaintiff's claims.

### II. **The SAC Is Not Vague or Incoherent**

Contrary to Defendants' claims, the SAC is not vague or contradictory. The references to specific dates, such as October 1-5, 2021, and August 28, 2021, serve to show the ongoing nature of the discrimination, not isolated incidents. The multiple counts are distinct legal theories that address various violations and are not redundant or overlapping.

### III. **Plaintiff's Pro Se Status Does Not Impact the Legitimacy of Claims**

While Plaintiff is pro se, the SAC is still sufficient. Pro se litigants are entitled to some leeway, and the SAC presents a clear narrative of the events that form the basis of the claims. Defendants should not be allowed to dismiss legitimate claims on procedural grounds simply because the Plaintiff lacks formal legal representation.

### IV. **Rule 8 Does Not Require Overly Simplified Complaints**

Rule 8 requires fair notice of the claims, not a perfectly concise complaint. The SAC provides ample factual detail, which is necessary due to the complexity and gravity of the issues involved. The length and detail of the complaint reflect the seriousness of the allegations, not an undue burden on Defendants or the Court.

### **Conclusion:**

Defendants' motion to dismiss should be rejected. The SAC clearly articulates the Plaintiff's claims and meets the requirements of Rule 8. Defendants' procedural arguments should not overshadow the substance of the allegations, which are grounded in real, actionable claims of civil rights violations. The case should proceed on its merits.

---

Plaintiff's Counter-Statement on Defendants' Motion to Dismiss:

Defendants' motion to dismiss the claims against the City of New York and individual Defendants is an attempt to evade accountability. The motion fails to address the substance of the Plaintiff's allegations, which are supported by both legal principles and factual evidence. Defendants' attempt to dismiss based on procedural issues disregards the serious and systemic violations of Plaintiff's civil rights.

I. **The Motion is an Attempt to Evade Accountability**

Defendants' motion is based on technicalities rather than substantive legal arguments. The Plaintiff's claims are rooted in racial discrimination and constitutional violations. Dismissing these claims on procedural grounds would shield Defendants from facing the serious allegations of misconduct.

II. **Plaintiff's Claims Are Legally Sufficient**

The SAC provides a thorough and clear account of the violations, explaining how each defendant's actions contributed to the broader pattern of discrimination. The claims are not vague or conclusory but are well-supported by specific, detailed instances of unlawful behavior. Plaintiff is entitled to a fair opportunity to litigate these claims.

III. **Dismissing the Claims Would Be an Injustice**

Granting the motion to dismiss would deny Plaintiff the right to seek justice for the violations he has suffered. It would send the wrong message that government and law enforcement entities can act with impunity. The Court must examine the facts and allow the claims to proceed.

**Conclusion:**

The motion to dismiss should be denied. The claims against the City of New York and the individual Defendants are legally sound and deserve to be fully litigated. Plaintiff has asserted his civil rights and should be allowed to pursue justice in court. The Court should reject Defendants' attempt to avoid responsibility and allow the case to proceed.

Respectfully submitted,