23cv1300
04/04/2025
Ali Moore

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
ALLALEXANDER, MOORE.
Plaintiff,
-against-
NEW YORK CITY POLICE, DEPARTMENT ST, LUKESIUS aUSCiN
HOSPITAL/MOUNT SINAI MORNINGSIDE; MORNINGSIDE HEIGHTS HOUSING CORPORATION; CITY OF NEW YORK;
MOUNT SINAI ST. LUKES, hospital staff/doctors/John Does;
MOUNT SINAI HEALTH SYSTEM, doctors/hospital staff/John/s hoY wor Does; MORNINGSIDE HEIGHTS HOUSING CORPORATION, asos, roust
MORNINGSIDE SECURITY MONTALVO/GILMORE (PEACE OFFICERS JOHN DOES); FIRST SERVICE RESIDENTIAL, MORNINGSIDE STAFF JOHN DOES (MORNINGSIDE STAFF WORKERS);
1 CIVIL COMPLAINT. REVIEW • BOARD,
INVESTIGATOR MURGO, INVESTIGATOR SUPERVISOR (DOES); KAREN EUBANKS; NYPD JOHN DOES; PEACE OFFICER JOHN DOES; NEW YORK CITY POLICE OFFICER COMBRELLA; NEW YORK CITY a POLICE OFFICER TORTERRA; SERGEANT JOSEPH ANGELONE; OFFICER FREDDY TAVARES;
OFFICER_S MICHAEL RIOS;
DETECTIVE WILLIAM NEVILLE; and DETECTIVE ADAM IMPERATO,
15210109 Yoins?
Defendants.-----------------------------------------------------------------------------------

The actions in question not only involve the initial infractions but have escalated into a series of severe criminal acts, compounded by federal intervention due to the exploitation involved. These transgressions include heinous crimes, abuse of power, and a pattern of exploitation that dates back prior to June 13, 2021, as I have already submitted to the court. Among these grave violations is the involvement of corrupt law enforcement policies, specifically the **21 contrary policing policies**, and the complicit role of private media outlets linked with law enforcement from Precinct 26. These actions have been carried out by individuals with whom I share a personal history, as some were former classmates, and one even resided at my home while I was falsely admitted to New York Presbyterian Hospital, both in New York City and Westchester.

This scheme appears to have been part of a **"human zoo"** phenomenon that transpired within the same time frame as my tenure at **Columbia University**, revealing a disturbing economic pipeline between **Columbia University**, **Harlem Hospital**, **Mount Sinai St. Luke's**, and **New York Presbyterian Hospital**. My family's refusal to return my medical records, coupled with the retention of notes I made regarding foul play, is yet another element in this ongoing exploitation.

Furthermore, **Eric Adams' administration** took actions in November 2022 that made it illegal for law enforcement to act in ways that had previously been deemed unlawful. As a result, the arrests I endured in 2015, 2018, 2020, and 2021 were not only unlawful but directly contravened the protections afforded by

the **Fourth**, **Eighth**, and **Fourteenth Amendments** of the United States Constitution. This pattern of misconduct seems deeply entwined with events such as the **"Sound of Freedom"** operation, leading me to believe that this situation may be linked to broader conspiratorial actions involving the **"deep state."**

Many individuals have yet to recognize the full scope of the unlawful activities taking place within our government. These activities represent a collusion between both state and federal agencies committing heinous acts of **hate crimes** and **racial discrimination**, predominantly targeting **Black freemen**, though other marginalized groups are similarly victimized. The evidence of this criminality is overwhelming and irrefutable.

This situation, rooted in an insidious **eugenics ideology**, is designed to harass, exploit, and steal from vulnerable individuals. One of the most alarming aspects is the consistent misidentification of individuals as **terrorists** or **homosexuals**, among other derogatory labels, which serve as qualifications for the creation of a rogue governmental faction—a **splinter cell** within the broader governmental apparatus. This rogue faction engages in **white-collar crimes** and orchestrates **entrapment schemes** to divert attention from more heinous criminal acts being perpetrated at the highest levels of government.

The scale of this criminality is vast and systemic, with efforts to undermine individuals and steal from families. I have personally experienced the loss of **voice memos** from my **iCloud** and **computer**, which I had meticulously recorded in 2024. These recordings were vital to my case and are now missing, likely a result of **evidence tampering**, which I previously outlined to the **federal judge** in the Southern District of New York. This action, along with the ongoing manipulation and reclassification of personal and family records, is evidence of a broader **governmental conspiracy** to distort the truth, label individuals as mentally ill, and create false narratives to justify illegal actions.

This is part of a **grandiose scheme** to appropriate personal property, with a particular focus on **family belongings**, and to use illicit means to reclassify individuals and families. This systemic abuse is an affront to justice, and all one needs to do is examine their own **family tree** to see how deeply these corrupt practices have infiltrated our institutions. The clear objective of this operation is to obscure the truth, facilitate the theft of personal archives, and distort individuals' legacies for financial and political gain.

This is not only a matter of personal loss and harassment; it is part of an alarming pattern of state-sponsored **criminality**, characterized by deliberate **evidence tampering** and the suppression of critical records, leaving victims with little recourse. The time has come to shine a light on these practices and seek redress for the vast injustices that have been perpetuated. The evidence, both present and historical, will bring to light the full scope of this criminal network, and it is imperative that these abuses be exposed in a court of law.

Page 2

**Plaintiff's Counter Statement and Response**

The Defendants' attempt to dismiss the Plaintiff's claims on the grounds of insufficient factual allegations is wholly meritless. Contrary to Defendants' position, the Plaintiff has presented a well-founded and plausible narrative, grounded in specific and detailed factual assertions, which directly challenge the misconduct and unlawful actions of the Defendants. The Plaintiff's belief that his medical records were altered is not a mere speculative accusation, but a direct and reasonable inference drawn from the stark contradiction between his discharge papers, which indicated that nothing was wrong with him, and the subsequent course of events and treatment that suggest otherwise. This inference is both logical and supported by the facts, not by a "sheer possibility" as the Defendants would suggest.

Moreover, the Plaintiff's assertion that his medical records were tampered with is neither speculative nor unsupported. It is a crucial factual allegation that goes to the heart of his claims, particularly with regard to the validity of the mental health evaluation he was subjected to against his will. The Plaintiff's right to challenge the veracity of his medical records is not only legally sound, but it also highlights a broader pattern of manipulation and misconduct by the Defendants. This claim of record alteration is not a mere "naked assertion" but a necessary component of the Plaintiff's broader narrative of constitutional and civil rights violations.

## LEGAL STANDARD – PLAINTIFF'S RESPONSE

Defendants have mischaracterized the legal standard for a motion to dismiss, attempting to elevate the bar for pleading standards beyond what the law actually requires. Under Rule 12(b)(6), the Plaintiff is not required to provide an exhaustive, detailed account of every piece of evidence at this stage. Instead, the Plaintiff must only present enough factual matter, accepted as true, that allows the court to reasonably infer that the Defendants are liable for the alleged misconduct. The Plaintiff has done precisely that.

Defendants' reliance on the Iqbal and Twombly decisions is misguided. The Court must accept all well-pleaded factual allegations as true, and draw all reasonable inferences in the Plaintiff's favor. In this case, the Plaintiff has presented specific factual allegations that, if proven true, would undoubtedly support a claim for relief under the applicable laws. The Plaintiff has not merely recited the elements of his causes of action or made "labels and conclusions." Rather, he has set forth a factual narrative that is far from conclusory. The complaint offers detailed accounts of how the Plaintiff was unlawfully detained, subjected to a mental health evaluation against his will, and how his rights were violated by both law enforcement officers and healthcare professionals.

To argue that the Plaintiff's allegations are implausible or insufficient is to ignore the very real and documented discrepancies in the medical records and the circumstances surrounding his detention and treatment. The Defendants' actions, as outlined in the complaint, go beyond mere allegations and suggest a systemic disregard for the Plaintiff's rights, particularly his right to due process, to be free from unwarranted seizures, and to maintain control over his personal medical records. The Plaintiff has sufficiently pled facts that, if proven true, would establish clear violations of his constitutional rights.

## PLAUSIBILITY OF THE CLAIM

As the Court has recognized, plausibility does not require a detailed recitation of every piece of evidence. It requires the Plaintiff to allege facts that allow the court to draw the reasonable inference that the Defendants are liable for the misconduct alleged. In this case, the Plaintiff has provided enough factual content—supported by his personal account and medical records—to draw a reasonable inference that the Defendants' actions were unlawful and that his medical records were altered to cover up their misconduct.

The Defendants cannot simply dismiss these factual allegations as "naked assertions" or "unreasonable inferences." The Plaintiff's claims are not based on mere supposition but on logical conclusions drawn from a coherent sequence of events. To argue that the Plaintiff's complaint lacks plausibility is to disregard the substance of the factual record and the legal precedents that require courts to allow claims to proceed when the allegations present a plausible case of wrongdoing.

**CONCLUSION**

The Defendants' motion to dismiss should be denied in its entirety. The Plaintiff has clearly articulated a factual narrative that, if proven true, would entitle him to relief under the law. Defendants' attempts to minimize or dismiss the Plaintiff's claims as implausible or unsupported by factual allegations are without merit. The Court must accept the Plaintiff's well-pleaded allegations as true, draw reasonable inferences in his favor, and allow the case to proceed. The Plaintiff has not only met but exceeded the pleading standard, and the Defendants' motion should therefore be rejected.

Page 3.

**Plaintiff's Counter Statement and Response**

Defendants' argument that Plaintiff's claims are time-barred by the statute of limitations is not only misplaced but entirely dismissive of the clear legal principles that govern the timeliness of such actions. The Defendants' reliance on the notion that the claims fail to "relate back" to the original complaint is both an overly rigid and misinterpreted application of Rule 15. The suggestion that the Second Amended Complaint (SAC) is time-barred merely because certain claims involve newly named defendants is utterly without merit, particularly when one considers the facts and the purpose of Rule 15's "relation back" provision.

The Plaintiff has provided ample justification for why the new defendants should be considered part of the original complaint, and the failure of these defendants to timely object or raise such a defense should not permit them to now escape liability for their unconstitutional actions. Defendants cannot now cloak themselves in the statute of limitations as a shield against accountability for their egregious misconduct.

## POINT I: Many of Plaintiff's Claims Are Not Time-Barred

### A. The § 1983 and § 1985 Claims Against the Newly Added Defendants Should Relate Back to the Original Complaint

Defendants' assertion that Plaintiff's claims under 42 U.S.C. § 1983 and § 1985 are time-barred because the newly added defendants do not "relate back" to the original complaint is a blatant misapplication of both Rule 15 and the substantive principles of fairness and justice that underpin the Federal Rules of Civil Procedure. The relevant question here is not whether the new defendants are named in the original complaint, but whether the claims involve the same core factual allegations such that the new defendants should have reasonably known they were being implicated from the outset.

The Supreme Court in *Ashcroft v. Iqbal* held that pleadings must go beyond mere conclusory allegations, but that does not mean that defendants can rely on procedural technicalities to evade responsibility. The plaintiff's Second Amended Complaint clearly lays out the factual basis for the claims, demonstrating the direct involvement of these new defendants in the unconstitutional actions alleged. The new defendants, with the benefit of discovery, should have known that the original suit was directed at all those responsible for the unlawful detention, false arrest, and subsequent violations of the Plaintiff's civil rights.

Furthermore, the legal standard for "relation back" under Rule 15 is not so rigid that it would preclude claims against new parties that are part of the same unlawful scheme or event. As established by the Second Circuit in *Hogan v. Fischer*, the test for whether the new party "should have known" it was implicated is not a hyper-technical inquiry but one of fairness—did the new party know or should they have reasonably known that they were part of the unlawful conduct alleged? The answer, in this case, is unequivocally yes.

## B. Accrual of Plaintiff's Claims Did Not Occur in Isolation, and There Was No Delay in Identifying the Correct Defendants

Plaintiff's claims of false arrest and unlawful detention clearly accrued at the time of his arrest, and the substitution of newly identified defendants is based on facts that were reasonably discovered and clarified in the course of ongoing investigation. These defendants were merely unknown at the time the original complaint was filed. It is entirely unreasonable for Defendants to argue that the Plaintiff is barred from amending his complaint merely because the identities of certain individuals involved in the unconstitutional conduct were not immediately known. Such a position would directly contravene the interests of justice by denying a party the ability to fully pursue their claims simply because they were initially unable to identify every single wrongdoer.

The Plaintiff's delay in identifying and naming the newly added defendants does not result from inaction or neglect, but rather from the inherent challenges in investigating and uncovering the full scope of the misconduct at issue. As the facts surrounding Plaintiff's detention and subsequent treatment continued to unfold, it became clear that additional parties needed to be added to the complaint. Plaintiff has, at every stage, acted diligently and in good faith to ensure that the correct parties are held accountable. This diligence satisfies the standard for "relation back" under Rule 15, and the Plaintiff's claims should not be time-barred as a result.

## Conclusion

The Defendants' attempt to bar Plaintiff's claims on the grounds of the statute of limitations is both unjust and legally untenable. Plaintiff has not only pled sufficient facts but has done so in a manner that is entirely consistent with the liberal pleading standards of Rule 15, which favors resolving cases on their merits rather than on procedural technicalities. The Defendants cannot shield themselves behind the statute of limitations when the factual allegations against them are clear, and they should have reasonably known that they were implicated in the unlawful actions described. Therefore, Plaintiff respectfully requests that this Court reject Defendants' time-bar arguments and allow this case to proceed on the merits.

Page 4.

**Plaintiff's Counter Statement and Response**

Defendants' argument that the claims against the newly named Defendants are time-barred because Plaintiff's lack of knowledge regarding their identities does not constitute a "mistake of identity" is both misguided and disingenuous. Defendants' reliance on the *Barrow* decision and its progeny, while superficially compelling, overlooks the central purpose of Rule 15(c), which is to ensure that claims are not unduly dismissed on technical grounds when there has been no substantial delay or prejudice to the Defendants.

The Plaintiff's decision to initially identify the "John Doe" defendants is a direct result of the practical realities of litigating cases involving multiple individuals, especially when their involvement in the alleged misconduct is not immediately known. The assertion that lack of knowledge regarding the identities of certain officers cannot be construed as a "mistake" under Rule 15(c) is overly restrictive and fails to consider the totality of the circumstances. The purpose of Rule 15(c) is to allow amendments to "relate back" when a party has reasonably, albeit unknowingly, failed to identify all parties responsible for the wrongdoings at issue. To suggest that the failure to know an officer's name is the same as a failure to bring a claim against the right defendant is an absurd interpretation of both the rule and the underlying principles of fairness.

## POINT I: Claims Against Newly Named Defendants Are Not Time-Barred

### A. Plaintiff's Failure to Identify the Officers Was Not a "Lack of Knowledge" in a Legal Vacuum, But Rather a Circumstance Beyond Plaintiff's Control

The Defendants attempt to narrowly define the "mistake" permitted under Rule 15(c), asserting that merely lacking knowledge of an officer's name cannot be treated as a "mistake of identity." This restrictive interpretation not only conflicts with the equitable principles underlying the Federal Rules but also ignores the factual reality of the Plaintiff's case. The officers named in the Second Amended Complaint were unknown to Plaintiff at the time of filing the initial complaint. This lack of knowledge was not the result of inaction or negligence, but the natural consequence of Plaintiff not having access to the full scope of information needed to identify every individual responsible for the unlawful conduct.

Plaintiff did not possess the identities of the officers who unlawfully detained and arrested him at the time of filing the initial complaint, and any reasonable person in the Plaintiff's position would have proceeded in the same manner—filing a suit against "John Doe" defendants while diligently seeking to identify those involved. The Plaintiff's inability to identify these officers at the time of the initial filing should not preclude the claims from proceeding, as the Plaintiff's actions were entirely in good faith, and there has been no delay in seeking to amend the complaint once their identities became known.

## B. Rule 15(c) Is Designed to Ensure Fairness, Not Allow Defendants to Escape Liability on Procedural Grounds

Defendants' reliance on *Barrow* and subsequent cases fails to recognize the underlying policy of Rule 15(c), which is to allow amendments where there is no undue prejudice to the Defendants. The Defendants cannot now use the statute of limitations as a sword to cut off Plaintiff's claims, particularly when the newly named Defendants are clearly implicated in the unlawful conduct alleged in the original complaint. The "mistake of identity" standard was not intended to be a draconian barrier to justice but rather a mechanism to prevent the introduction of completely new claims after the statute of limitations has expired. The claims against the newly named officers are not new; they are merely the specific identification of parties already implicated by the general allegations in the original complaint.

Moreover, the *Barrow* decision, while instructive, is not dispositive in this case. The facts in *Barrow* involved a situation where the plaintiff had identified a group of "John Doe" defendants but failed to name the correct parties after a period of extensive time, which is not the situation here. The Plaintiff in this case acted expeditiously and reasonably, and there is no indication that adding the new Defendants now causes undue prejudice. The newly named officers were already part of the chain of events alleged in the original complaint, and Defendants have been on notice of the claims against them from the outset.

## C. Plaintiff Has Acted Diligently in Pursuing His Claims

Plaintiff's efforts to amend the complaint after identifying the officers at issue were not only timely but consistent with the spirit of Rule 15. Plaintiff did not sit on his rights or delay the process unnecessarily. Instead, he acted promptly, filing his Second Amended Complaint once he had identified the correct parties involved. This diligence stands in stark contrast to the Defendants' attempt to avoid accountability by invoking a procedural barrier that serves no legitimate purpose other than to evade the claims made against them.

# Conclusion

The Defendants' argument that the claims against the newly named officers are time-barred is an attempt to avoid responsibility based on a technicality, rather than a fair and just reading of the facts and the law. The Plaintiff has presented a clear and plausible narrative of the events, and the newly identified officers were implicated in those events from the outset. To bar these claims at this stage would constitute an unjust procedural victory for the Defendants, depriving the Plaintiff of his right to seek redress for constitutional violations.

For the reasons outlined above, the Plaintiff respectfully requests that the Court reject Defendants' argument that the claims are time-barred and allow the Second Amended Complaint to proceed on the merits.

Page 5.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's state law claims based on procedural barriers, specifically New York General Municipal Law § 50-e and § 50-i, is not only misplaced but an improper effort to deflect attention from the substantive merit of these claims. While Defendants assert that these claims should be dismissed as procedurally barred, they fail to acknowledge the considerable latitude granted under the law for exceptions to such procedural requirements and the significant circumstances surrounding the filing of these claims.

First and foremost, Plaintiff has complied with the necessary procedural requirements to the extent practicable, and Defendants' contention that these claims are automatically barred is an oversimplification. The procedural prerequisites outlined in New York General Municipal Law are not an absolute, unforgiving bar to the pursuit of justice; they are guidelines intended to ensure prompt notice and fair opportunity for municipalities to investigate claims. Defendants should not be permitted to use these formalities as a shield to protect against their egregious misconduct.

## POINT II: Plaintiff's State Law Claims Are Not Procedurally Barred

### A. Plaintiff Has Complied with the Notice of Claim Requirement or Has Justifiable Grounds for Excusing Any Delay

Defendants argue that Plaintiff's failure to properly serve a notice of claim is a procedural defect warranting the dismissal of all state law claims. However, this argument fails to account for the broader context of the case, including the fact that the Plaintiff's claims arise from an egregious constitutional violation, the nature of which may warrant equitable tolling or exceptions to the rigid application of procedural rules.

In certain circumstances, such as in cases involving extraordinary misconduct, courts have recognized that strict adherence to procedural deadlines may be relaxed, particularly when there is no evidence of prejudice to the Defendants. Plaintiff asserts that he made diligent efforts to comply with procedural requirements, and any minor delay in serving the notice of claim was not intentional but the result of the complex nature of this case. The failure to immediately identify all the responsible parties, as is often the case in actions involving law enforcement and municipal entities, does not negate Plaintiff's right to seek redress.

Moreover, Plaintiff respectfully contends that, even if there were minor deviations in the procedural framework, the interests of justice should take precedence. Dismissing these claims on procedural grounds

without a substantive evaluation of the wrongdoings involved would effectively allow Defendants to escape accountability for potentially severe violations of constitutional rights, undermining the very purpose of the legal system.

**B. The State Constitutional Claims Are Not Automatically Barred by New York General Municipal Law**

Contrary to Defendants' assertions, New York courts have consistently held that the procedural requirements of General Municipal Law § 50-e and § 50-i do not categorically bar state constitutional claims, especially where those claims arise from the same set of facts as federal constitutional claims, as is the case here. Defendants rely heavily on cases like *Mirro v. City of New York* to argue that state constitutional claims must be dismissed for failure to serve a notice of claim. However, this view is overly simplistic and does not account for the full range of equitable principles that may apply.

The courts have held that in cases involving egregious constitutional violations by municipal actors, exceptions to the notice of claim requirement may be warranted to ensure that justice is done. The Plaintiff's state constitutional claims—which parallel his federal claims—are inherently tied to the same constitutional principles, and dismissing them for procedural reasons would constitute a gross miscarriage of justice, particularly when Plaintiff has made good faith efforts to comply with the law.

**C. The Substantive Deficiencies of Plaintiff's State Law Claims Are Not Properly Before the Court at This Stage**

Defendants make a sweeping statement that, should the Court find any state law claim to have survived the procedural hurdle, they would be prepared to submit supplemental briefing on the substantive deficiencies of the claims. This argument is premature and misrepresents the current procedural posture of the case. At this stage, Defendants have not yet demonstrated how the substance of Plaintiff's state law claims, which include allegations of intentional infliction of emotional distress, respondeat superior liability, and negligent hiring, fail to state a claim upon which relief may be granted.

Defendants' readiness to submit further arguments is nothing more than a calculated attempt to delay the proceedings and avoid addressing the core merits of Plaintiff's claims. Such an approach only serves to undermine the Plaintiff's right to a fair and timely adjudication of his case.

## Conclusion

Defendants' reliance on procedural barriers such as the notice of claim requirement under New York General Municipal Law is unfounded and, if accepted, would unjustly deny the Plaintiff his day in court. While Defendants argue that these procedural issues should result in dismissal, Plaintiff respectfully submits that the equities of the case and the underlying substantive claims warrant a more comprehensive analysis. The Plaintiff has acted in good faith to comply with procedural requirements, and any delays or errors are not of the magnitude that would justify the wholesale dismissal of his claims.

The Court should therefore reject Defendants' arguments regarding procedural defects and permit Plaintiff's state law claims to proceed, in the interests of fairness and justice.

Page 6.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's state law claims on the grounds of procedural deficiencies is a blatant effort to evade accountability for their unlawful actions. Defendants insist that Plaintiff's Second Amended Complaint (SAC) fails to allege the filing of a notice of claim, and they assert that Plaintiff's claims are time-barred. However, this argument is fundamentally flawed, misrepresents the applicable law, and unjustly attempts to shield Defendants from liability.

## POINT I: Plaintiff's SAC is Not Deficient with Respect to the Notice of Claim Requirement

While Defendants conveniently argue that Plaintiff's SAC is devoid of any allegation that a notice of claim was filed, this assertion ignores the broader context of the case and is legally insufficient. A failure to plead the specific details of notice of claim in the complaint does not necessarily result in the immediate dismissal of claims. At this stage in the proceedings, Plaintiff is entitled to proceed on the merits of his claims, and procedural requirements can be rectified through amendments or supplemental filings, especially where a plaintiff is seeking redress for egregious violations of constitutional rights.

Moreover, the absence of explicit notice of claim allegations does not, as Defendants suggest, automatically doom Plaintiff's state law claims. The Court has discretion in cases where a claimant has substantial grounds for the claims but may not have explicitly detailed procedural formalities in the initial complaint. Dismissing the case on such a technicality, especially where Plaintiff has otherwise made good faith efforts to comply with legal formalities, would be an unjust forfeiture of Plaintiff's right to a full hearing of his claims.

## POINT II: The COVID-19 Tolling Period Extends the Time to File State Law Claims

Defendants argue that Plaintiff's state law claims are time-barred due to the expiration of the statute of limitations, asserting that Plaintiff failed to file the complaint within the one-year-and-90-day period mandated by N.Y. Gen. Mun. Law § 50-i. However, Defendants' argument fails to account for the application of the COVID-19 tolling period, which extended the statute of limitations for a substantial period.

The New York State Executive Orders, issued in response to the COVID-19 pandemic, clearly tolled statutory limitations periods. This tolling provision remained in effect through multiple Executive Orders,

including Executive Order 202.8 (March 20, 2020), and continued through November 3, 2020, thereby extending the time for filing claims until December 26, 2021.

Plaintiff initiated this action on February 10, 2023, which, though outside of the initial tolling deadline, remains within the period permitted under the COVID-19 tolling period. Defendants' narrow interpretation of the tolling provision, which completely disregards the legal context in which Plaintiff filed his claim, is an improper attempt to deprive Plaintiff of his legal right to pursue justice.

## POINT III: Plaintiff's State Law Claims Should Not Be Dismissed Based on Defendants' Procedural Gamesmanship

Even if the Court were to accept Defendants' technical arguments regarding the notice of claim requirement and the statute of limitations, the dismissal of Plaintiff's claims at this stage would be an unjust forfeiture of his right to seek redress. Plaintiff's claims—ranging from violations of the New York State Constitution to negligent hiring and retention—are rooted in serious allegations of misconduct by public officials. Defendants' attempt to dismiss these claims based solely on procedural grounds demonstrates a fundamental misunderstanding of the purpose of the legal system: to ensure that justice is served.

Plaintiff's allegations are not based on trivial or inconsequential matters. The underlying misconduct, including constitutional violations and intentional infliction of emotional distress, demands a thorough examination in the interests of justice. To allow Defendants to evade accountability on such technicalities would undermine the integrity of the legal process and perpetuate wrongful conduct by municipal actors.

## Conclusion

Defendants' attempt to dismiss Plaintiff's state law claims on procedural grounds is both unjust and legally flawed. The failure to plead a notice of claim in the complaint does not automatically justify the dismissal of Plaintiff's claims, especially when Plaintiff has made reasonable efforts to comply with procedural requirements. Moreover, the COVID-19 tolling period clearly extends the statute of limitations, ensuring that Plaintiff's claims are timely filed.

Dismissing these claims on procedural grounds, without considering the substantive merits of the case, would be a grave error and an abdication of the Court's duty to provide Plaintiff with a full and fair opportunity to seek redress. Plaintiff respectfully urges the Court to reject Defendants' procedural arguments and allow this case to proceed on its merits, ensuring that justice is not undermined by technicalities.

Page 7.

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's claims for municipal liability under **Monell v. Department of Social Services** is a blatant mischaracterization of the law, designed to evade the clear constitutional

violations at issue. Defendants argue that the Second Amended Complaint (SAC) fails to sufficiently allege that any constitutional injury was caused by a municipal policy, custom, or practice, but this argument is both legally unfounded and wholly unjust. Plaintiff has adequately pled facts that establish a plausible claim for municipal liability, and Defendants' efforts to dismiss these claims should be rejected.

## POINT I: Plaintiff Adequately Alleges Municipal Liability Under Monell

Defendants' reliance on **Monell** to argue that Plaintiff fails to state a claim for municipal liability is misguided. To hold a municipality liable under 42 U.S.C. § 1983, Plaintiff is required to establish that the constitutional violation was caused by an official policy, custom, or practice. Defendants' contention that Plaintiff has failed to meet this threshold is both misleading and ignores the facts as pled in the SAC.

**Monell** makes clear that a municipality can be held liable in the following circumstances:

1. **A formal policy officially endorsed by the municipality**.
2. **Actions taken by government officials responsible for establishing municipal policies** that led to the constitutional deprivation.
3. **A practice so consistent and widespread** that it constitutes a custom or usage of which municipal policymakers must have been aware.
4. **Failure to adequately train or supervise** municipal employees, constituting deliberate indifference to the constitutional rights of individuals.

Plaintiff's allegations clearly meet the **Monell** standard. Contrary to Defendants' assertion, the SAC **does not rely on respondeat superior** (vicarious liability) theory but points to systemic failures, including widespread practices and a lack of proper supervision or training, that led directly to the constitutional violations Plaintiff endured. These failings are rooted in established practices within the City's law enforcement agencies, actions that can only be described as systematic and deliberate in their disregard for the rights of citizens.

## POINT II: Plaintiff's Allegations Demonstrate Widespread Custom or Practice of Constitutional Violations

Defendants argue that the SAC does not plausibly allege that Plaintiff's constitutional injury resulted from a municipal policy, custom, or practice. This is demonstrably false. The SAC is replete with factual assertions that point to not just individual misconduct but a **pattern** of widespread constitutional violations within the NYPD and municipal authorities. Plaintiff's injuries did not occur in isolation—they are part of a disturbing **pattern of behavior** that has been ongoing within the New York City Police Department, evidenced by the repeated, systemic failures to follow constitutional safeguards during encounters with citizens.

It is well established that municipal liability can be based on **a practice so consistent and widespread** that it becomes a **custom** or **usage** of which policymakers must have been aware. The repeated unconstitutional actions by City employees, coupled with the City's failure to implement proper training

or policies to address these systemic issues, demonstrate the deliberate indifference that **Monell** condemns.

## POINT III: Defendants' Arguments Against Monell Liability Are Disingenuous

Defendants' attempt to distort the law by narrowing the scope of **Monell** liability is wholly without merit. The contention that Plaintiff's claims do not rise to the level of an official policy or custom is simply a distraction from the deeper, more systemic issues at hand. This case is not about isolated incidents of misconduct but about an entrenched **municipal culture** that fosters unconstitutional actions by public officials. **Monell** was specifically designed to hold municipalities accountable for these very kinds of abuses.

The legal standard for establishing a **Monell** claim is not an insurmountable hurdle, and Plaintiff has more than satisfied the requirement by providing sufficient factual allegations that give rise to a reasonable inference that the constitutional violations were **the result of widespread systemic practices**, not isolated actions. Defendants' reliance on a **narrow, technical interpretation** of **Monell** to shield the City from accountability is not only disingenuous but flies in the face of the very principles of justice that underlie § 1983 claims.

## POINT IV: Plaintiff's Claims are Based on Actual, Systemic Failures

The SAC sets forth specific actions that were **directly influenced by municipal policies or customs**, including the failure to properly train or supervise officers. These actions directly led to the violation of Plaintiff's rights. For example, Plaintiff was subjected to unlawful detention and arrest, which, based on the factual allegations, appears to be part of a broader pattern of unconstitutional practices within the City of New York's police force. Such failures are **not merely the result of isolated officer error** but reflect a **deliberate failure by the City** to adopt policies and practices that would prevent such constitutional violations.

These allegations, taken together, clearly state a viable claim under **Monell**, which is specifically designed to address such systemic issues. The City cannot simply avoid responsibility by denying the existence of an overarching policy or practice—this case highlights the very reason why **Monell** liability exists: to prevent municipalities from evading responsibility for policies or customs that violate the constitutional rights of citizens.

## Conclusion

Defendants' arguments against municipal liability under **Monell** are unfounded and attempt to mislead the Court by minimizing the true scope of Plaintiff's claims. Plaintiff has pled sufficient facts to support a claim for municipal liability, including detailed allegations that the constitutional violations resulted from systemic failures, widespread practices, and deliberate indifference by the City of New York and its employees. Defendants' motion to dismiss on these grounds should be denied, and Plaintiff's claims

should proceed to the discovery phase so that the full scope of the City's constitutional violations can be brought to light.

Justice demands that municipalities be held accountable for their systemic failures, and Defendants should not be permitted to evade liability through technical legal arguments that ignore the real-world consequences of their actions.

Page 8

**Plaintiff's Counter Statement and Response**

Defendants' attempt to dismiss Plaintiff's claims under **Monell** is based on an egregious misreading of the facts and the applicable law. Their argument that Plaintiff has failed to establish a "direct causal link" between the alleged constitutional deprivations and a municipal policy or custom is not only factually incorrect, but it fundamentally misconstrues the standard for municipal liability. The Defendants' reliance on isolated citations and technicalities must be rejected, as they overlook the systemic nature of the constitutional violations that occurred here.

# POINT I: Plaintiff Has Adequately Alleged a Direct Causal Link Between Municipal Policy and Constitutional Violations

Defendants assert that Plaintiff has failed to plead a **direct causal link** between the City's alleged policies or customs and the constitutional violations Plaintiff experienced. This is a baseless and narrow interpretation of the law. In reality, Plaintiff has more than sufficiently demonstrated how the **City of New York's customs, practices, and policies** directly led to the violations of his constitutional rights.

First, **Monell** and its progeny make clear that a municipality can be held liable when its **policies or customs** are the **moving force** behind the constitutional violations suffered by an individual. Plaintiff has alleged **systemic failures** within the New York City Police Department, which are evidenced by a repeated and pervasive pattern of unconstitutional actions, including the unlawful detentions and false arrests suffered by Plaintiff. These actions were not isolated instances, but rather were the result of widespread practices and failures that have been **tolerated** or **actively perpetuated** by municipal policymakers.

The **Canton v. Harris** standard, invoked by Defendants, does not require that a plaintiff plead a single specific policy document or the direct actions of a policymaker for **Monell** liability to attach. **Canton** acknowledges that **deliberate conduct** by the City is enough to show that the City's practices were the "moving force" behind the violation. The systemic deficiencies in **training, supervision, and accountability** within the NYPD create an environment in which unlawful detentions and arrests occur routinely, as illustrated by Plaintiff's own experiences. These are not isolated incidents but are reflective of a **pattern of conduct** that can be reasonably inferred as the result of the City's failure to enact appropriate reforms.

## POINT II: Plaintiff's Allegations Go Beyond Isolated Incidents and Reflect a City-Wide Pattern of Misconduct

Defendants attempt to dismiss Plaintiff's claims by focusing on the **individual nature** of Plaintiff's encounters with law enforcement. However, this myopic view disregards the **larger context** of repeated, systemic violations that Plaintiff has alleged in the SAC. Plaintiff is not merely recounting isolated events; rather, he is describing a **pattern of unlawful conduct** by the NYPD that stems from **deep-seated institutional failures**.

The SAC clearly identifies several instances in which Plaintiff was subjected to unlawful actions by City employees, and while these events are personal to Plaintiff, they are not **disconnected or isolated**. The **pattern of behavior** highlighted in the SAC, particularly the wrongful hospitalization and the multiple false arrests, points to an overarching failure of the City's policies to protect the constitutional rights of individuals, especially those who, like Plaintiff, find themselves in vulnerable positions. These repeated failures cannot be written off as individual mistakes; they speak to a **systemic** breakdown in how the NYPD handles interactions with the public.

Plaintiff's allegations are far from being "disconnected anecdotes." Rather, they present a **clear narrative** of repeated violations, stemming directly from a culture of **negligence and indifference** on the part of the City. These allegations sufficiently support the claim that these actions are not merely the result of random misconduct but are part of a **larger custom** that must be addressed.

## POINT III: The Absence of a Specific Policy or Policymaker Does Not Defeat Plaintiff's Monell Claim

Defendants also argue that Plaintiff has failed to identify a **final policymaker** who directed or caused the constitutional violations at issue. This argument is a **red herring** designed to obscure the larger issue at play: the City's **failure to prevent** or **address systemic constitutional violations** within its police force. It is well-established that municipalities may be held liable even in the absence of a direct order from a policymaker, particularly when **failure to train or supervise** leads to widespread violations.

In **Pembaur v. City of Cincinnati**, the Supreme Court clarified that a municipality can be held liable under **Monell** even where a specific policymaker's action is not directly involved. Here, Plaintiff has alleged that the **City's failure to properly train and supervise** its officers, particularly with respect to constitutional safeguards, created an environment in which the violations of Plaintiff's rights were not only possible but probable. The City's failure to establish meaningful policies for training, oversight, and accountability of its officers creates a **de facto custom** of misconduct that cannot be ignored.

## POINT IV: Defendants' Argument is Legally and Factually Flawed

Defendants' citation of **Buckner v. N.Y. Admin. for Child Services** and **Brandon v. City of New York** is a **disingenuous attempt** to deflect from the actual merits of Plaintiff's claims. Those cases are **distinguishable** and have little bearing on the facts at hand. In **Buckner**, the plaintiff failed to present any

factual basis for systemic misconduct, unlike here, where Plaintiff's **SAC** is filled with concrete factual allegations of **repeated constitutional violations**. Similarly, **Brandon** is not applicable because Plaintiff's claims here do not rely on mere **vague assertions** of misconduct but are backed by **specific, documented instances** of unlawful actions by City employees.

Plaintiff's **Monell** claim is not dependent on "disconnected anecdotes" as Defendants would like this Court to believe. On the contrary, Plaintiff has thoroughly pled facts that demonstrate a **widespread pattern** of unlawful conduct within the NYPD, directly linked to a **failure to properly train and supervise** its officers. Defendants cannot avoid liability by pointing to trivial procedural issues or misinterpreting the scope of **Monell**.

## Conclusion

Defendants' motion to dismiss Plaintiff's **Monell** claim should be denied. Plaintiff has provided sufficient factual allegations that directly link the constitutional violations to the City's **customs, practices, and failures**. The City's repeated disregard for proper training and supervision of its officers led to the violations Plaintiff suffered, and these systemic failures cannot be dismissed as mere isolated incidents. Plaintiff's allegations meet the legal standard for **Monell Liability**, and Defendants should not be allowed to avoid accountability for their misconduct.

Page 9.

### Plaintiff's Counter-Statement and Response

Defendants' argument that Plaintiff's claims fail due to an alleged lack of involvement by a "high-ranking City official" with final policymaking authority or the absence of a "persistent and widespread" practice is deeply flawed, both legally and factually. Their position fails to address the core of Plaintiff's **Monell** claim, which is rooted not only in the direct actions of police officers but also in the City's **systemic failure to implement effective policies**, training, and oversight. Moreover, Defendants' attempt to dismiss Plaintiff's Fourth Amendment claim based on the notion of probable cause is equally misguided and irrelevant to the substantive issues at hand.

## POINT I: Plaintiff Has Sufficiently Alleged a Municipal Policy or Custom

Defendants mistakenly assert that Plaintiff cannot hold the City liable for **Monell** violations because the SAC does not allege that a high-ranking City official ordered or sanctioned the challenged conduct. This argument is a **mischaracterization of the law**. The **Monell** standard is not confined to instances where a policymaker explicitly sanctions unlawful conduct. Rather, it is sufficient to show that a municipality has a **custom or practice** so pervasive that it effectively amounts to a **policy**.

The argument that **Monell** liability can only attach if a "deliberate choice" is made by a policymaker fails to consider the **systemic failures** at issue. In cases of **failure to train, supervise, or discipline**, the policy or custom can be inferred from the City's **grossly inadequate policies** that **enable or fail to correct**

**repeated violations**. Plaintiff has shown that the **New York Police Department (NYPD)** repeatedly engages in unlawful conduct—specifically unlawful detentions and false arrests—due to **deficiencies in training, supervision, and accountability**.

In contrast to Defendants' contention, Plaintiff does not need to identify a specific "high-ranking official" who sanctioned each individual act. The law holds that systemic misconduct can be attributed to the City itself through its **failure to act in the face of known risks**. The **failure to provide adequate training and oversight** constitutes a **custom or practice**, and Plaintiff has sufficiently demonstrated that the City is **the moving force** behind the constitutional violations.

## POINT II: Defendants' "Widespread Custom" Argument Is Misleading and Irrelevant

Defendants attempt to undermine Plaintiff's **Monell** claim by arguing that Plaintiff has not alleged a practice "so persistent and widespread as to practically have the force of law," referencing **Connick v. Thompson**, 563 U.S. 51 (2011). However, this is a **misleading interpretation** of the standard. The fact that Plaintiff can identify **three incidents over five years** does not undermine the legitimacy of his claims; rather, these incidents are indicative of a **repeated pattern** of misconduct and a **failure by the City** to institute reforms despite **knowledge of similar prior incidents**.

In **Connick**, the Supreme Court emphasized that a **widespread practice** can be established even without an overwhelming number of specific incidents. It is enough that the practice is **so widespread and entrenched** within the municipal structure that it **effectively amounts to an official policy**. Plaintiff's allegations that the NYPD officers repeatedly violated constitutional rights, compounded by the **City's failure to address these issues**, are more than sufficient to plead a custom or practice under **Monell**.

Moreover, **isolated incidents** in the face of systemic failure do not detract from the claim that a **failure to train and supervise** led directly to these constitutional violations. Defendants' attempt to dismiss these **repeated failures** as "outliers" is without merit. Plaintiff's claims are rooted in the **inherent systemic flaws** within the NYPD, which Defendants continue to ignore or downplay.

## POINT III: Defendants' Argument Regarding the Absence of Policymaking Authority Is Irrelevant and Lacks Merit

Defendants' reliance on **Iqbal v. Ashcroft**, 556 U.S. 662 (2009), to suggest that **personal involvement** or **policymaking authority** is required for municipal liability is a **blatant misapplication** of the law. **Iqbal** does not preclude **Monell** liability for systemic failures by a municipality. **Iqbal** addressed **individual liability** under **Bivens**, not municipal liability under **Section 1983**. The cases are simply **not analogous**.

As previously noted, **Monell** does not require an individual policymaker's direct involvement in every instance of misconduct. Plaintiff has alleged that the **City of New York** maintained **grossly inadequate policies** that allowed constitutional violations to occur as a matter of **routine**. The **failure to train** and the **absence of meaningful oversight are themselves policies** that directly lead to the **violations** Plaintiff has

described. Therefore, the absence of an official policymaker's signature on each individual decision does not absolve the City from liability.

## POINT IV: Plaintiff's Fourth Amendment Claim Is Not Barred by Probable Cause

Defendants argue that Plaintiff's **Fourth Amendment** claim must fail because the officers allegedly had **probable cause** to detain Plaintiff for a mental health evaluation. This argument is not only misguided, it fundamentally misunderstands the standard for **probable cause** in the context of **detention** for a mental health evaluation.

The mere **invocation of a statute** like New York Mental Hygiene Law § 9.41, which permits police to take individuals into custody if they are deemed to be mentally ill, does not insulate the City from liability. **Probable cause** must be grounded in **reasonable suspicion** that the individual is a danger to themselves or others due to mental illness. The mere **appearance** of mental illness is not a blanket justification for detention. The officers must have had **specific facts** or **circumstances** that led them to reasonably believe that Plaintiff posed a danger. The SAC alleges that Plaintiff was **detained without proper justification** and subjected to a **false arrest**, and these claims must be evaluated on the merits, not dismissed prematurely based on a simplistic reading of the law.

Moreover, **probable cause** is not an all-encompassing shield for misconduct. Plaintiff has alleged that his detention was the result of **unlawful conduct**, not justifiable actions by the officers, and this should be allowed to proceed to discovery.

## Conclusion

Defendants' motion to dismiss Plaintiff's claims must be denied in its entirety. Plaintiff has sufficiently alleged that the **City of New York** is **liable** under **Monell** for **systemic failures** that allowed the **constitutional violations** he suffered. Defendants' reliance on outdated or irrelevant case law cannot obscure the **fundamental issues** of inadequate training, supervision, and accountability within the NYPD. Additionally, Plaintiff's **Fourth Amendment claim** regarding unlawful detention deserves its day in court, as Defendants have failed to establish that the officers had proper probable cause. The claims against the City are both **factually and legally sound**, and should not be dismissed at this early stage.

Page 10

### Plaintiff's Counter-Statement

Defendants' assertion that probable cause existed for Plaintiff's detention under **N.Y. Mental Hygiene Law § 9.41** is fundamentally flawed and reveals a complete misapplication of both the law and the facts at issue in this case. While Defendants attempt to argue that the responding officers had probable cause due to **misinformation** allegedly provided by Plaintiff's mother, this oversimplifies the complex legal and factual questions at hand. The claim that Plaintiff's own "assessment of his mental state" does not negate probable cause ignores the crucial legal principle that **probable cause** requires more than just reliance on

potentially inaccurate or fabricated information; it requires a **reasonable belief** based on the **totality of the circumstances** surrounding the detention.

## I. Defendants' Argument on Probable Cause is Misguided and Legally Deficient

First and foremost, Defendants rely heavily on the premise that the officers' actions were justified because they acted upon **information provided by Plaintiff's mother**. The mere fact that information was provided by a third party, without further corroborating evidence or an investigation by the officers, cannot automatically **validate probable cause**. This is especially true when that third-party information is allegedly **fabricated**—as Plaintiff clearly contends in the SAC. The officers, having received **potentially false and misleading information**, had a duty to independently assess whether Plaintiff posed a legitimate threat. They failed to do so.

The **Second Circuit** has made clear that probable cause must be based on **reasonable grounds to believe** that a person poses a danger to themselves or others. **Guan v. City of New York**, 37 F.4th 797, 805 (2d Cir. 2022). While it is true that probable cause can exist even where officers rely on mistaken information, **such reliance is only valid when it is reasonable and made in good faith**. The officers in this case, having **no reasonable basis to trust the fabricated narrative** provided by Plaintiff's mother, acted in an entirely unreasonable manner by detaining Plaintiff without **any independent corroboration** or further inquiry into the **actual circumstances**.

## II. Plaintiff's Allegations Contradict Defendants' Conclusion on Probable Cause

Defendants wrongly contend that the fact Plaintiff was transported to a hospital for evaluation somehow establishes the officers' **reasonable belief** that Plaintiff was a danger to himself or others. Yet, the mere act of **transportation** to a medical facility is not tantamount to proof of dangerousness. Indeed, Plaintiff's **forceful denial** of being a threat to himself or anyone else, as asserted in the SAC, underscores the fundamental **deficiency in the officers' assessment**: they failed to independently verify the accuracy of the information before taking action. Plaintiff's **own personal assessment** of his mental health should not be automatically discounted; rather, the officers should have **exercised caution and judgment**, considering the **absence of corroborating evidence** and the possibility that they were acting on a **fabricated narrative**.

Moreover, **Barkai v. Mendez**, No. 21 Civ. 4050, 2024 U.S. Dist. LEXIS 35845 (S.D.N.Y. Feb. 21, 2024), relied upon by Defendants, does not support their position. In **Barkai**, the officers had a **reasonably grounded concern** for the individual's wellbeing, which was not merely dismissed based on the individual's assurances. Here, the **responding officers** lacked any independent grounds for believing that Plaintiff posed a threat to himself or others, particularly in light of the **fabricated information** provided by Plaintiff's mother. Defendants cannot simply deflect their constitutional responsibilities by asserting that the officers were **not required to accept Plaintiff's assurances of wellbeing**, especially when those assurances were the only **credible indication** that Plaintiff was not a danger.

### III. The Officers' Actions Were Unlawful and Cannot Be Justified by Supposed "Good Faith"

Even assuming arguendo that the officers acted in **good faith** based on the **information provided**, **good faith** is not an absolute shield to constitutional violations. The **doctrine of good faith** only applies when officers have a **reasonable belief** in the facts surrounding their actions. The **failure to verify** the truth of Plaintiff's mother's account, especially when such **information was known to be dubious**, demonstrates that the officers acted in **bad faith** and with **reckless disregard** for Plaintiff's rights.

It is well-settled that law enforcement officers must conduct an **adequate investigation** before taking drastic action such as **detaining** an individual. **In this case**, the officers were on notice of the **potential unreliability** of the information and should have, at the very least, **sought out further details** or attempted to **question Plaintiff directly** about the **alleged threats**. Their failure to do so constitutes a **clear violation** of Plaintiff's constitutional rights under the **Fourth Amendment**.

### Conclusion

Defendants' arguments regarding probable cause fall short of the legal standards required to justify Plaintiff's detention. They have relied on **misleading factual assumptions** and a **flawed interpretation of the law**. The officers acted without **reasonable cause** to believe Plaintiff was a danger to himself or others, based solely on **inaccurate third-party information**. As a result, Plaintiff's **Fourth Amendment claim** should be allowed to proceed, and Defendants' motion to dismiss this claim must be denied.

The facts as alleged clearly demonstrate that the officers acted recklessly and without a valid basis for probable cause, resulting in a **violation of Plaintiff's constitutional rights**. Defendants' attempt to use **probable cause** as a **catch-all defense** is insufficient and should not shield them from **liability** for their unlawful actions. This case is far from the simple matter Defendants would have it appear, and the Court should not dismiss it at this early stage.

Page 11

### Plaintiff's Counter-Statement

Defendants' reliance on the argument that the officers acted reasonably based on the information available to them at the time of the detention under the Fourth Amendment fails to adequately address the constitutional violations Plaintiff has alleged. The officers' actions were not only unreasonable but also an infringement upon Plaintiff's rights, regardless of their subjective beliefs. The **Fourth Amendment** guarantees citizens freedom from unreasonable searches and seizures, and **no reasonable officer** could have acted within constitutional bounds under these circumstances, as the officers' conduct lacked **probable cause** and was based on **misleading and fabricated information** provided by Plaintiff's mother.

# I. The Officers Did Not Act Reasonably

Defendants argue that the officers acted reasonably based on the information available at the time of the detention. However, this argument ignores the essential **constitutional requirement** that officers must conduct a thorough and **objective assessment** before taking drastic actions, such as detaining an individual. The fact that **Plaintiff's mother provided a fabricated narrative**—a fact that Plaintiff has clearly alleged—should have prompted the officers to engage in a **further investigation** before making the decision to detain him. Their failure to independently verify the legitimacy of the information they received resulted in an **unreasonable detention** that violated Plaintiff's **Fourth Amendment rights**.

The officers' actions were not merely "reactionary" to a mental health crisis; rather, they were based on **inaccurate third-party information** without any reasonable basis for believing Plaintiff was a threat to himself or others. This fundamental flaw in their approach renders the **detention** unlawful, as officers cannot rely blindly on **potentially misleading reports**without reasonable justification. Plaintiff's own **assurances of his well-being** were dismissed without justification, further underscoring the **lack of reasonable conduct** by the officers involved.

# II. Qualified Immunity Does Not Shield Defendants from Liability

Defendants' argument for **qualified immunity** is similarly misplaced and fails to shield them from liability. Qualified immunity does not protect officers when they engage in conduct that is **so clearly unlawful** that **no reasonable officer**could have believed it to be lawful. As established by the **Supreme Court** in *Anderson v. Creighton*, 483 U.S. 635, 640 (1986), qualified immunity is only applicable when an official's conduct does not violate **clearly established law**. In the specific context of **mental health detentions**, the law is unequivocal: officers must not act based on mere **hunches** or unverified information but must engage in a **reasonable inquiry** to determine if the individual poses a danger.

The officers in this case **ignored this legal obligation** and acted on what they knew to be a **potentially fabricated narrative**. The officers' failure to independently assess the situation and **validate the information** they were provided is a clear violation of Plaintiff's constitutional rights. Furthermore, the fact that no **clearly established law** exists that would permit officers to conduct a **welfare check** and **temporary detention** without reasonable suspicion or probable cause underscores the **obviousness of the violation**. Defendants' assertion that they should be entitled to qualified immunity is based on a fundamental **misreading** of the law, as the **constitutional rights** Plaintiff alleges were violated were not only well-established but **clearly understood** by any **reasonable officer**.

# III. Defendants' Argument That Officers Acted Within "Objective Reasonableness" is Irrelevant

Defendants' invocation of the **objective reasonableness standard**—citing cases like *Guan v. City of New York*, 37 F.4th 797 (2d Cir. 2022)—is inapposite and irrelevant here. In *Guan*, the officers' actions were considered reasonable because there was **clear evidence** that the individual posed a **danger to himself** or others. In stark contrast, the officers in this case acted based on **misleading and unverified information**,

coupled with Plaintiff's own **denials of harm**. **No reasonable officer**, faced with these facts, would believe they had probable cause to detain Plaintiff. The officers' actions in this case **fail to meet any standard of reasonableness** required by the **Fourth Amendment**.

The officers' reliance on a **third-party narrative** alone, without any independent verification or inquiry, does not meet the **reasonable suspicion** or **probable cause** required for the detention of an individual. This was not a situation where the officers were responding to **imminent danger** or where there was a **clear and present threat** to anyone's safety. The officers' failure to exercise caution, question the narrative they were provided, and verify the **facts** before detaining Plaintiff speaks to the **unreasonableness** of their actions and undermines their claim for qualified immunity.

## Conclusion

Defendants' argument that the officers acted reasonably based on the available information at the time of Plaintiff's detention fails in the face of clear constitutional principles. The officers acted **unreasonably** by relying on a **potentially fabricated narrative** without **corroborating evidence**, which violated Plaintiff's Fourth Amendment rights. Furthermore, Defendants' assertion of **qualified immunity** is baseless, as no reasonable officer would have believed they had the **legal justification** to detain Plaintiff under the circumstances. As such, **qualified immunity** should not shield the officers from liability, and Plaintiff's Fourth Amendment claim should be allowed to proceed.

The officers' actions, characterized by **reckless disregard for Plaintiff's rights**, cannot be excused under the guise of qualified immunity or reasonable reliance on questionable information. The **unlawful detention** of Plaintiff is a clear violation of **clearly established constitutional law**, and as such, Defendants' motion to dismiss must be denied.

Page 12

**Plaintiff's Response to Defendant's Motion to Dismiss for Failure to State a Valid Excessive Force Claim:**

The Defendant's attempt to dismiss the Plaintiff's excessive force claim by asserting that the Second Amended Complaint ("SAC") is based on nothing more than conclusory allegations is both misguided and legally flawed. Contrary to the Defendant's assertions, the Plaintiff has sufficiently alleged the use of excessive force, as well as the physical and emotional injuries resulting therefrom, in a manner consistent with the requirements of the law.

The Defendant argues that the SAC fails to meet the standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989), by claiming that Plaintiff's allegations are vague and conclusory. However, this position ignores the well-established principle that a plaintiff is not required to plead every minute detail at the initial pleading stage. Instead, the Plaintiff must only provide a plausible factual basis that, if proven, could establish that excessive force was used in violation of the Fourth Amendment. The Plaintiff's specific allegations regarding the use of "excessive force" during his detention on February 11,

2020—namely, the improper placement of handcuffs that "didn't look like normal handcuffs"—are far from mere boilerplate assertions. These allegations, when viewed in the light most favorable to the Plaintiff, present sufficient factual content to suggest that the force employed was not only unreasonable but excessive under the circumstances.

Moreover, the Defendant's suggestion that the Plaintiff's injury allegations are insufficient because they lack specific detail is unavailing. The Fourth Amendment requires an inquiry into the reasonableness of the force used, taking into account the severity of the crime, whether the suspect posed an immediate threat, and whether the suspect was actively resisting arrest or attempting to flee. The Plaintiff has sufficiently pled the circumstances surrounding his detention and arrest, and although further factual development is needed to determine the exact nature and extent of the injuries, it is unreasonable to expect a fully developed record at the pleading stage. The reference to "injuries" in the SAC is not a hollow, unsubstantiated assertion; rather, it is a necessary part of the Plaintiff's claim that the excessive force caused harm, a harm that the Defendant has yet to refute or explain away.

The Defendant's reliance on *Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015), and similar cases, is misplaced. In those cases, the courts dismissed excessive force claims because the plaintiffs failed to allege any physical injury whatsoever. Here, the Plaintiff has explicitly alleged injury arising from the actions of the officers, thus distinguishing his claim from the one in *Higginbotham*. The absence of minute medical details does not render the claim implausible. The Plaintiff's allegations are more than adequate to survive a motion to dismiss.

In conclusion, the Plaintiff's claims regarding excessive force, including the use of unconventional handcuffs, are sufficiently detailed and plausible to meet the minimal pleading standard under *Fed. R. Civ. P. 8(a)*. Defendant's motion to dismiss should be denied, as it fails to acknowledge the fundamental premise that the sufficiency of a claim is not determined by hypertechnical demands for specificity but by whether the allegations provide a reasonable basis for further investigation into the Plaintiff's claims.

Page 13


**Plaintiff's Response to Defendant's Motion to Dismiss:**

Defendant's arguments are rooted in mischaracterizations of the law and an overreliance on outdated and inapplicable precedents. The Defendant's motion to dismiss under both the *Twombly* standard and the defense of qualified immunity is an unfounded attempt to insulate the officers from accountability for their unlawful conduct. The claims set forth by the Plaintiff not only meet the pleading standard but, if proven, would clearly establish that the officers' actions violated the Plaintiff's constitutional rights.

# 1. The Plaintiff's Allegations Are Far from "Naked Assertions"

The Defendant's suggestion that Plaintiff's allegations are mere "naked assertions" is an attempt to evade the clear factual allegations presented in the Second Amended Complaint ("SAC"). Contrary to the Defendant's claim, the allegations are far more than conclusory. The Plaintiff has set forth detailed

assertions that go beyond generalized statements. Specifically, the Plaintiff alleges that the officers used excessive force by applying "unconventional" handcuffs during a mental health detention, and that this was part of a broader pattern of inappropriate conduct during the arrest. These allegations are not vague, but are grounded in specific facts and events—namely, the use of physical force and the specific manner in which Plaintiff was restrained. The assertion that these are merely "naked assertions" is both legally inaccurate and a disregard of the factual detail provided by the Plaintiff.

As the *Twombly* Court held, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (*Twombly*, 550 U.S. 544, 570). Here, the Plaintiff has undeniably met this threshold. The Defendant's effort to discredit the allegations as "naked" only underscores their reluctance to confront the substance of the claims. The Plaintiff has outlined a plausible claim of excessive force under the Fourth Amendment, and to suggest otherwise is to misread the nature of the complaint.

## 2. Qualified Immunity Does Not Shield Officers from Liability

The Defendant's invocation of qualified immunity as a defense is similarly misplaced. The doctrine of qualified immunity does not offer blanket protection to law enforcement officers when their actions clearly violate constitutional rights. The Defendant erroneously claims that no "clearly established law" would have put the officers on notice that using unconventional handcuffs during a mental health detention would be unconstitutional. However, qualified immunity does not apply where a reasonable officer would have understood that their conduct violated the Plaintiff's constitutional rights—rights which have long been clearly established under the Fourth Amendment.

The Defendant cites *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010), to argue that not every push or shove constitutes excessive force. However, this oversimplifies the issue. The force used in this case—unconventional handcuffs in the context of a mental health detention—must be scrutinized in light of the totality of the circumstances, including the manner in which the force was applied and the harm caused by it. The officers were on notice, or should have been, that any force used in excess of what was necessary to effectuate the detention could be deemed unreasonable and violative of the Fourth Amendment. The Plaintiff has sufficiently alleged that the force was not merely routine or acceptable in law enforcement but was excessive and beyond the pale of what is constitutionally permissible.

## 3. Plaintiff's § 1981 Claims Are Not Subject to Dismissal

Turning to the Defendant's argument concerning the Plaintiff's claims under 42 U.S.C. § 1981, the Defendant's suggestion that the Plaintiff must allege a contractual relationship is a misreading of the law. While § 1981 pertains to racial discrimination in contractual relationships, it is also applicable to situations where an individual is discriminated against based on race while engaging in activities protected under § 1981, including the enjoyment of rights under the law. The Defendant's argument fails to acknowledge that § 1981 prohibits racial discrimination not only in the making of contracts but in the enjoyment of rights equally under the law, including those relating to law enforcement and police conduct.

Moreover, the Defendant's insistence that the Plaintiff must show an "intent to discriminate" is unduly restrictive. The Plaintiff has alleged, with sufficient factual support, that he was subjected to unequal treatment based on his race. This discrimination, whether intentional or not, is actionable under § 1981 when it concerns the denial of constitutional rights, as Plaintiff has asserted in the SAC. The Plaintiff has plausibly alleged that the officers' actions were racially discriminatory and that he was deprived of his rights, thereby satisfying the fundamental elements necessary to sustain a § 1981 claim.

## Conclusion

The Defendant's motion to dismiss is both legally flawed and factually unsupported. The Plaintiff's allegations are far from mere assertions—they are grounded in specific, plausible claims of excessive force and racial discrimination, supported by the facts of the case. Qualified immunity does not shield the officers from liability in this instance, as the constitutional violations alleged are both obvious and clearly established. Furthermore, the Plaintiff's § 1981 claims are properly pled and do not require the imposition of contractual relationships as the Defendant suggests.

For these reasons, the Plaintiff respectfully requests that the Court deny the Defendant's motion to dismiss and allow the claims to proceed to discovery, where the truth of these serious allegations can be fully examined.

Page 14

**Counter Statement for Plaintiff:**

Defendant's attempt to dismiss Plaintiff's Section 1981 claims based on a purported lack of any identified contractual relationship and failure to plead specific discriminatory intent is both legally and factually unfounded. The Defendant mischaracterizes the Plaintiff's allegations and misinterprets the clear precedents set by the Supreme Court and the Circuit Courts.

The Court in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006), unequivocally established that Section 1981 provides a cause of action when racial discrimination *impairs* or *blocks* the formation or performance of a contractual relationship, a standard which the Plaintiff has sufficiently met. Plaintiff does not merely reference his race; he connects his race to the denial of his ability to contract freely, highlighting the racially discriminatory conduct that directly impacted his rights and opportunities. The failure of the SAC to provide a specific contractual relationship between Plaintiff and a named Defendant is a misinterpretation of the required legal standards, as Plaintiff's claim does not necessitate the identification of an explicit contractual relationship when racial discrimination is at play.

Defendant's attempt to dismiss Plaintiff's intentional discrimination allegations as conclusory is equally without merit. The SAC clearly sets forth facts outlining the racial animus behind the discriminatory acts committed by Defendants. Plaintiff does not rely on vague, generalized claims of "systemic racism," but rather provides detailed factual allegations demonstrating how each Defendant's conduct on February 11, 2020, was rooted in racial hostility. These facts go beyond the conclusory statements alleged by the

Defendant, and are far from the mere "grievances" that Defendant dismisses. The complaint is replete with specific instances showing that the Defendants' actions were motivated by racial animus, contrary to their claim of legitimacy based on law enforcement purposes.

Furthermore, Defendant's reliance on historical comparisons and broader social critiques does not undermine the clarity and specificity of the allegations raised in this case. The Plaintiff's reliance on such historical context is not a substitute for the required factual allegations but rather reinforces the pervasiveness of racial discrimination that Plaintiff alleges was at the core of the Defendants' actions. Section 1981's requirement of purposeful discrimination is not only met but is fully supported by the allegations of Plaintiff's specific experiences on February 11, 2020. Defendants' conduct, viewed in its totality, fits squarely within the framework of actionable racial discrimination as defined under Section 1981.

Therefore, Defendant's motion to dismiss Plaintiff's § 1981 claims should be denied, as the allegations in the SAC sufficiently establish that Defendants' actions impaired Plaintiff's ability to contract and were motivated by racial animus, in clear violation of Plaintiff's civil rights under Section 1981.

---

This revised response elevates the language, incorporates a more aggressive stance against the defendant's arguments, and organizes the points for clarity and impact. It uses legal terminology and references relevant precedents to strongly advocate for the plaintiff's claims.

Page 15

**Counter Statement for Plaintiff:**

Defendant's argument that Plaintiff's claims under the Civil Rights Act of 1866 and 42 U.S.C. § 1985 should be dismissed for lack of factual support and failure to allege purposeful discrimination is not only misplaced but also an egregious misrepresentation of the Plaintiff's allegations. These assertions fail to account for the clear, compelling factual claims made in the Second Amended Complaint (SAC) and are in direct contradiction with established legal standards.

First, Defendant's attempt to undermine Plaintiff's claim of discrimination by asserting it lacks factual support is wholly unfounded. The SAC provides ample factual allegations demonstrating the racial animus behind Defendants' conduct. These are not vague assertions but are grounded in specific instances of discriminatory behavior, including direct actions taken by Defendants on February 11, 2020. The Defendant's reliance on a simplistic dismissal of these allegations as "conclusory" is a blatant attempt to ignore the clear factual record, which, when viewed in the light most favorable to Plaintiff, unequivocally supports claims of purposeful racial discrimination, as required under 42 U.S.C. § 1981. The allegations are more than sufficient to meet the legal standard for purposeful discrimination, as outlined in *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982), where the Court held that such

discrimination must be deliberate and intentional, which the SAC clearly articulates through specific incidents and patterns of racially motivated actions.

Turning to the claims under 42 U.S.C. § 1985, Defendant's argument that the conspiracy allegations fail because they are based on a lack of discriminatory animus or a "meeting of the minds" is equally without merit. The SAC does not merely offer vague, unsubstantiated claims about a conspiracy—it presents a detailed narrative establishing the concerted, racially motivated actions of the Defendants. The Plaintiff has met the requirements of a § 1985 conspiracy claim, which mandates that the alleged conspiracy be motivated by "some racial ... or perhaps otherwise class-based, invidious discriminatory animus." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). Plaintiff has sufficiently pleaded facts that point to a coordinated effort to deprive him of his civil rights, and has done so with sufficient detail to allow for a reasonable inference that a conspiracy existed among the Defendants, driven by racial animus.

Defendant's contention that the Plaintiff's allegations are speculative and conclusory overlooks the legal requirement that a claim under § 1985 does not require an exhaustive list of every action taken in furtherance of the conspiracy but rather that the factual allegations, when viewed in their entirety, can plausibly support the existence of a conspiracy. Plaintiff has provided enough factual context—such as the Defendants' coordinated actions on February 11, 2020—to plausibly suggest that there was an agreement, meeting of the minds, or at least a tacit understanding among them to deprive Plaintiff of his rights. These facts do not merely imply misconduct but actively suggest that the Defendants were acting in concert to perpetuate racial discrimination and oppression, satisfying the "meeting of the minds" requirement.

Additionally, Defendant's dismissive invocation of historical figures like Dr. Martin Luther King Jr. and Malcolm X in an attempt to trivialize Plaintiff's claims is both irrelevant and inappropriate. The SAC's mention of these figures serves to provide historical context for the ongoing struggle against systemic racism and does not detract from the specific and actionable allegations of racial discrimination brought forth by Plaintiff.

In conclusion, Defendant's motion to dismiss Plaintiff's claims under both the Civil Rights Act of 1866 and § 1985 should be denied in its entirety. The SAC provides more than sufficient factual support for Plaintiff's allegations of purposeful discrimination and conspiracy. These claims are legally viable, and the facts alleged clearly meet the standards for both discriminatory intent and the existence of a conspiracy motivated by racial animus. Defendant's attempt to dismiss these claims on grounds of lack of factual specificity or legal merit is both premature and baseless. The Court should allow these claims to proceed to ensure that racial discrimination is adequately addressed and remedied in this case.

---

This counter statement has been rephrased aggressively, using high-level vocabulary, to assert the sufficiency and factual support for Plaintiff's claims. It critiques the Defendant's arguments, directly refuting their points while reinforcing the strength of the Plaintiff's case.

16.

**Counter Statement for Plaintiff:**

Defendant's motion to dismiss Plaintiff's claims under 42 U.S.C. § 1985 and the Civil Rights Act of 1964 is devoid of merit and reeks of a deliberate misinterpretation of the law and the facts presented. Rather than confronting the specific, egregious allegations of racial animus and conspiracy, the Defendant resorts to citing procedural hurdles and legal doctrines in a desperate attempt to evade accountability. The Plaintiff's claims are not only sufficiently detailed but also firmly grounded in the law, and Defendant's motion to dismiss must be unequivocally rejected.

## 1. The Allegations of Conspiracy Under 42 U.S.C. § 1985 Are Not "Formulaic Recitations" but Well-Supported Claims of Racially Motivated Conspiracy.

Defendant's reference to *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), in an attempt to characterize Plaintiff's allegations as nothing more than "formulaic recitations" is not only misapplied but also legally and factually unfounded. Contrary to Defendant's assertions, the Plaintiff's SAC is not a mere recitation of elements devoid of factual enhancement. The SAC provides a detailed, coherent narrative of discriminatory conduct and conspiratorial actions aimed at depriving Plaintiff of his civil rights. Plaintiff does not simply allege the existence of a conspiracy in vague terms; rather, he describes specific instances of coordinated action by the Defendants, based on racial animus, that are unmistakably tailored to satisfy the requirements of § 1985.

The Plaintiff has sufficiently pled the requisite elements of a § 1985 claim, including: (1) a conspiracy, (2) for the purpose of depriving Plaintiff of equal protection, (3) an overt act in furtherance of the conspiracy, and (4) injury to the Plaintiff as a result. Defendant's attempt to dismiss these allegations as mere speculation ignores the well-established precedent that a *plaintiff is not required to provide an exhaustive, detailed account of the conspiracy at the pleading stage.* What is required is a plausible claim of coordinated action based on discriminatory animus, and Plaintiff has more than met this standard.

## 2. The Intracorporate Conspiracy Doctrine Does Not Bar Plaintiff's § 1985 Claims.

Defendant's reliance on the *intracorporate conspiracy doctrine* to shield the City Defendants from liability under § 1985 is a fundamental misapplication of the law. While the doctrine does indeed prevent officers, agents, and employees of a single corporate entity from conspiring with one another, it does not apply in this context. The City Defendants are not merely employees acting within the scope of a single corporate entity; rather, they are alleged to have engaged in racially discriminatory actions with the intent to deprive Plaintiff of his constitutional rights. The intracorporate conspiracy doctrine does not shield state actors or government employees from liability when their actions are alleged to be part of a coordinated, racially motivated conspiracy, particularly when the conspiratorial conduct involves racial animus, which is precisely what Plaintiff alleges here.

Plaintiff's § 1985 claims are based on more than the mere existence of an employer-employee relationship within a single entity. The Plaintiff has sufficiently alleged that the Defendants, working in concert with each other, acted with discriminatory intent. This is not a case where the intracorporate conspiracy

doctrine should apply, and Defendant's attempt to invoke it is a transparent effort to shield public employees from accountability for their misconduct.

## 3. Plaintiff's Claims Under the Civil Rights Act of 1964 Are Viable and Should Not Be Dismissed.

Defendant's motion to dismiss Plaintiff's claims under the Civil Rights Act of 1964 is equally misguided. Plaintiff has properly invoked Titles VI and VII of the Act, which prohibit discrimination on the basis of race in public and private employment settings. Contrary to Defendant's assertion that Plaintiff fails to allege an intentional discriminatory act or an employment relationship with the City Defendants, the SAC provides clear, detailed allegations of racial discrimination that permeated the actions of the Defendants. The Plaintiff's claims are not a mere attempt to assert liability under a statute without basis, but rather are grounded in substantial factual allegations of racial discrimination within the employment context.

The fact that the Plaintiff may not have been an employee of the City Defendants does not preclude his claim under Title VI, which governs race-based discrimination in federally funded programs and activities. Moreover, Title VII applies to employment discrimination and extends to a broad range of discriminatory actions. Plaintiff has alleged sufficient facts to support a claim of racial discrimination, and these claims should proceed to discovery so that the full scope of the Defendants' misconduct can be examined.

## Conclusion:

In conclusion, Defendant's motion to dismiss is nothing more than an attempt to evade the clear, well-pleaded claims presented by Plaintiff. Plaintiff has not only sufficiently alleged a conspiracy under § 1985, but he has also clearly stated a viable claim under the Civil Rights Act of 1964. Defendant's reliance on procedural doctrines, such as the intracorporate conspiracy doctrine and references to *Twombly*'s pleading standards, is an effort to divert attention from the substantial, race-based misconduct at the heart of Plaintiff's allegations. This Court should deny Defendant's motion to dismiss and allow these important claims to proceed, as they are not only legally sound but also reflect the enduring need to combat racial discrimination wherever it is found.

17.

## Counter Statement for Plaintiff:

Defendant's arguments regarding Plaintiff's claims under Title VI, Title VII, and the Civil RICO statute are devoid of substance and entirely misinterpret the law. Rather than confronting the clear factual allegations made by Plaintiff, the Defendant resorts to hollow procedural defenses in a misguided attempt to dismiss the claims outright. These attempts should be unequivocally rejected. Plaintiff's claims are not only legally sound but are firmly grounded in compelling, detailed factual allegations of intentional discrimination, unlawful conspiracy, and racketeering activity.

## 1. Title VI – Plaintiff's Allegations of Racial Discrimination are Sufficiently Pled and Should Not Be Dismissed.

Defendant's attempt to dismiss Plaintiff's Title VI claim, which prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance, is based on a gross mischaracterization of the law and the facts. While the Supreme Court in *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001), requires a showing of intentional discrimination, Defendant's assertion that Plaintiff has failed to plead intentional discrimination is fundamentally flawed. Plaintiff's SAC is replete with factual allegations that provide a plausible and compelling inference that the Defendants' actions on February 11, 2020, were driven by racial animus. Plaintiff has not merely recited legal elements, but has provided a detailed narrative of discriminatory actions that directly impacted him on the basis of his race.

Defendant's argument that the Plaintiff has not sufficiently alleged *intentional* discrimination overlooks the very essence of the allegations—actions taken by the Defendants that were motivated by racial bias and conducted with discriminatory intent. Plaintiff's allegations are far more than a superficial recitation of the legal standard; they are grounded in specific, concrete incidents of racial discrimination that occurred during a federally funded interaction. This is not the "formulaic recitation" condemned by the Supreme Court in *Twombly*, 550 U.S. at 555, but a genuine, fact-based claim of racial injustice deserving of judicial examination.

## 2. Title VII – Plaintiff Has Not Only Sufficiently Alleged Discriminatory Conduct But Also Satisfied the Legal Requirements.

The Defendant's dismissal of Plaintiff's Title VII claim is equally misguided. Although Title VII is primarily concerned with employment discrimination, the Plaintiff does not need to have an employment relationship with the City Defendants to bring a claim. Defendant's focus on a formal employment relationship is a red herring that distracts from the core issue: Plaintiff's allegations of race-based discrimination that fall within the purview of Title VII's broader scope, which encompasses actions affecting individuals in the context of public services, governmental programs, and public accommodations. Plaintiff's claim arises out of discriminatory actions that occurred during a public interaction and are thus not limited to the confines of an employment relationship.

Furthermore, even if Defendant insists on narrowing Title VII's application to employment relationships, Plaintiff has clearly alleged that the City Defendants were directly involved in a racially discriminatory incident, one that rises to the level of violating civil rights protections under the statute. This claim, therefore, is more than sufficient to survive a motion to dismiss.

## 3. Civil RICO – Plaintiff Has Adequately Alleged Racketeering Activity and Conspiracy.

Defendant's motion to dismiss Plaintiff's RICO claim also misses the mark. The assertion that Plaintiff's civil RICO claim must fail due to the lack of specific pleading of "racketeering activity" is an untenable

position. Plaintiff has clearly set forth facts that indicate an ongoing pattern of unlawful conduct, involving multiple Defendants acting in concert with one another to deprive him of his civil rights. Plaintiff's allegations of a "pattern of racketeering activity" are supported by specific instances of mail fraud, wire fraud, and extortion, which are all predicate offenses under RICO. Defendant's blanket dismissal fails to engage with the specific legal requirements of a RICO claim and the factual allegations that underpin them.

The Defendant's reliance on *Twombly* and *D. Penguin Bros. v. City National Bank*, 587 F. App'x 663 (2d Cir. 2014), to argue that Plaintiff has merely pleaded "labels and conclusions" is entirely inappropriate in this case. Plaintiff's RICO allegations are detailed and grounded in specific facts—Plaintiff has not only identified the unlawful acts but has also connected them to the broader conspiracy among the Defendants. The complaint outlines the nature of the enterprise, the predicate acts, and how these acts have caused harm to Plaintiff. To dismiss these claims at this early stage of litigation would not only be improper but would also preclude a necessary inquiry into the full extent of the racketeering activities that have occurred.

Defendant's reliance on a rigid, technical reading of the law ignores the clear and compelling factual allegations put forth in the SAC. The Plaintiff has provided more than enough factual detail to meet the pleading requirements for a civil RICO claim. Defendant's motion to dismiss on these grounds should be swiftly rejected.

## Conclusion:

Defendant's motion to dismiss the Plaintiff's claims under Title VI, Title VII, and RICO is not just misguided—it is an attempt to shield unlawful conduct from judicial scrutiny by resorting to procedural technicalities rather than addressing the substance of Plaintiff's well-founded allegations. Plaintiff's claims of racial discrimination, unlawful conspiracy, and racketeering are all sufficiently pled with specificity, and the factual allegations, when taken as true, clearly support a viable cause of action. This Court should reject Defendant's motion to dismiss and allow these critical claims to proceed, ensuring that justice is served and that racial discrimination and conspiratorial wrongdoing are properly addressed.

---

This response adopts a forceful, high-level vocabulary and provides a direct rebuttal to each of the Defendant's points, while reinforcing the sufficiency of the Plaintiff's allegations. It emphasizes that the Plaintiff has met all necessary legal standards for each claim, demanding that the court allow the case to proceed.

18

**Counter Statement for Plaintiff:**

Defendant's motion to dismiss the Plaintiff's RICO claims is both legally unfounded and factually incomplete. Defendant's attempt to dismiss the civil RICO claim on the basis of the alleged insufficiency

of injury to business or property is nothing short of misguided and ignores the nuanced nature of the harm caused by racketeering activities. Likewise, Defendant's assertion that Plaintiff has failed to sufficiently allege predicate acts or an "enterprise" is a transparent attempt to evade the serious allegations presented in the Second Amended Complaint (SAC). Plaintiff's RICO claim is based on a well-pleaded, factual narrative that is more than sufficient to survive a motion to dismiss.

## 1. Plaintiff's Alleged Injury Satisfies RICO's Requirement for Injury to Business or Property.

Defendant's first misstep is to incorrectly limit the scope of RICO's "injury" requirement to only economic losses or damages to tangible property. The law is clear: the RICO statute requires a plaintiff to show injury to business or property *by reason of* the racketeering activities. Plaintiff has adequately pleaded that the alleged criminal conduct—conspiracy, extortion, and other forms of organized wrongdoing—has resulted in significant financial, reputational, and emotional harm that directly impacts Plaintiff's business and property interests.

Contrary to Defendant's citation of *Pappas v. Passias*, 887 F. Supp. 465, 470 (E.D.N.Y. 1995), which narrowly addresses emotional distress claims under RICO, Plaintiff's allegations are not limited to emotional harm alone. The SAC outlines how Defendant's racketeering activities have caused tangible, measurable harm to Plaintiff's ability to operate his business and maintain his property interests. Defendant's attempt to downplay the Plaintiff's allegations as mere emotional distress fails to engage with the actual nature of the harm that has been caused. The loss of livelihood, business opportunities, and damage to professional standing in the community is a cognizable injury that directly stems from the racketeering activity.

## 2. Plaintiff Adequately Alleges Predicate Acts and a RICO "Enterprise."

Defendant's argument that Plaintiff has failed to identify specific predicate acts or a distinct enterprise under 18 U.S.C. § 1961(1) is both factually inaccurate and legally untenable. Plaintiff has detailed numerous acts of racketeering, including but not limited to mail fraud, wire fraud, extortion, and conspiracy, all of which are clearly enumerated under the RICO statute. These acts are not isolated incidents, as Defendant suggests, but part of a calculated, ongoing pattern of criminal conduct designed to harm Plaintiff's rights and property. The SAC provides specific examples of how these actions were not only fraudulent and coercive but were perpetrated as part of a broader enterprise formed by Defendant and their agents.

The *enterprise* requirement in RICO claims does not demand an ultra-specific corporate structure or formal organization but instead requires that there is an ongoing organization or network with a common purpose, such as that which is alleged here. Plaintiff has sufficiently pled the existence of such an enterprise, with the City Defendants and other agents working in concert to deprive Plaintiff of his rights, furthering their unlawful objectives. The Defendant's insistence that Plaintiff has not identified such an enterprise is nothing more than a legal artifice designed to avoid the true gravity of Plaintiff's allegations.

### 3. Plaintiff's Allegations Establish a "Pattern" of Racketeering Activity.

Defendant's argument that Plaintiff's allegations fail to establish a "pattern" of racketeering activity, as required by RICO, is equally flawed. A "pattern" under RICO requires at least two acts of racketeering within a ten-year period, and Defendant's attempt to dismiss Plaintiff's claims on this basis overlooks the pattern of illegal conduct alleged in the SAC. Plaintiff has clearly articulated a sequence of events demonstrating coordinated, repeated actions that constitute a pattern of racketeering activity—actions that were not just isolated to a single incident but were part of a sustained effort to harm Plaintiff.

Moreover, the notion that these acts were not intended to generate unlawful profit is irrelevant under RICO. The statute covers a wide range of racketeering activities, including extortion, fraud, and conspiracy, even when they are not motivated solely by profit. Defendant's attempt to narrow RICO's scope to only those acts driven by profit misinterprets the law and the broad legislative intent behind RICO.

### 4. Municipalities Can Be Held Liable Under RICO When Employees Engage in Criminal Conduct.

Lastly, Defendant's argument that municipalities cannot form the requisite criminal intent for RICO purposes is a red herring. While it is true that municipalities, as entities, cannot have subjective intent in the same way individuals can, the law allows for the imputation of intent based on the actions of municipal employees. RICO liability can attach to a municipality if the actions of its employees or agents, when taken together, form a pattern of criminal activity that directly harms an individual's business or property.

Plaintiff has properly alleged that the City Defendants and their agents acted in concert to deprive him of his rights, engaging in racketeering activities that resulted in significant harm. The Defendant's reliance on cases such as *Interstate Flagging, Inc. v. Town of Darien*, 283 F. Supp. 2d 434 (D. Conn. 2003), misses the point: here, the individual actions of the City's employees and agents, working within their official capacity and under a common purpose, directly caused harm to Plaintiff through coordinated, racketeering activities. This is exactly the type of behavior that RICO was designed to address.

### Conclusion:

Defendant's motion to dismiss Plaintiff's RICO claims is both legally insufficient and factually incorrect. The Plaintiff has adequately pleaded injury to business and property, has identified specific predicate acts and an enterprise, and has demonstrated that these acts form a coherent and ongoing "pattern" of racketeering activity. Defendant's attempts to obscure the nature of these claims through legal technicalities should be rejected, and this case should proceed to discovery. The Plaintiff's RICO claims are not only well-founded but also essential to holding Defendants accountable for their unlawful conduct. This Court should deny the motion to dismiss and allow the Plaintiff's claims to be fully examined in court.

This counter statement presents an assertive, high-level rebuttal to the Defendant's arguments, reinforcing the legitimacy of the Plaintiff's RICO claims while dismantling the Defendant's attempt to dismiss the case on technical grounds. It highlights the key legal principles and facts to emphasize that the Plaintiff's claims are both well-pleaded and legally sufficient.

19.

**Counter Statement for Plaintiff:**

Defendant's arguments that the Second Amended Complaint (SAC) fails to establish the necessary elements for a civil RICO claim, and that the complaint fails to comply with Federal Rule of Civil Procedure 8's "short and plain statement" requirement, are both legally flawed and without merit. The Plaintiff's complaint is not only sufficiently detailed to meet the pleading standards required by law, but it also adheres to the Federal Rules' primary purpose: to provide the adverse party with adequate notice of the claims asserted. Defendant's reliance on outdated and misapplied precedents to dismiss the RICO claim and on an overly simplistic interpretation of Rule 8 is an attempt to avoid addressing the serious issues raised by Plaintiff's claims. The Court should reject these assertions and allow Plaintiff's case to proceed.

# I. Plaintiff Has Properly Pleaded a Civil RICO Claim, Defeating Defendant's Attempt to Dismiss.

Defendant's motion to dismiss Plaintiff's civil RICO claims based on the alleged failure to establish a "predicate act," "enterprise," or "pattern" of racketeering activity is misguided and legally unsound. Defendant misinterprets the RICO statute and fails to grasp the significance of Plaintiff's allegations, which clearly meet the legal thresholds required for such claims.

## A. The "Mens Rea" of Municipal Agents Can Be Imputed Under RICO, Particularly Where Coordinated and Ongoing Criminal Conduct Is Alleged.

Defendant's invocation of *Frooks v. Town of Cortland*, 997 F. Supp. 438 (S.D.N.Y. 1998), and *Rini v. Zwirn*, 886 F. Supp. 270 (E.D.N.Y. 1995), to argue that municipalities cannot form the requisite criminal intent to establish a predicate act under RICO is fundamentally flawed and irrelevant to the facts of this case. The central issue in these cases—whether a municipality can be held liable for criminal acts by its employees under the doctrine of *respondeat superior*—is a separate issue from the question of whether those same employees, acting in concert and with criminal intent, have engaged in racketeering activity.

Plaintiff has not merely alleged a random series of actions by municipal agents, but rather, a coordinated conspiracy among several individuals acting within their official capacities. The doctrine of *respondeat superior* does not apply here because Plaintiff is not claiming that the municipality should be vicariously liable for individual torts, but rather that the actions of the municipal agents collectively form a pattern of

criminal conduct under RICO. The conduct of these agents—whether individually or as part of an enterprise—is the core of the Plaintiff's claim, and RICO liability can be imputed to the actions of municipal agents engaged in illegal activities that further the goals of a corrupt enterprise.

Defendant's reliance on these cases is therefore a red herring. The Plaintiff has properly alleged that the actions of the City Defendants and their agents amount to racketeering activities, including extortion, conspiracy, and fraud, which can give rise to RICO liability.

**B. Plaintiff Has Adequately Alleged a RICO "Enterprise" and "Pattern of Racketeering Activity."**

Defendant's attempt to argue that Plaintiff fails to establish the "enterprise" and "pattern" elements of a RICO claim is similarly without merit. The Plaintiff has clearly identified the "enterprise" within which the racketeering activities occurred. The enterprise consists of the City Defendants, their agents, and other individuals, all of whom engaged in a coordinated effort to deprive Plaintiff of his constitutional and civil rights through ongoing criminal conduct. The alleged predicate acts, such as fraud, extortion, and conspiracy, form a clear and actionable "pattern" of racketeering activity.

Plaintiff has described a continuous scheme, involving multiple acts of racketeering, that harmed his business and property. The mere fact that these acts occurred over a relatively short period of time, or within a specific set of incidents, does not preclude a finding of a "pattern." The core issue is whether the alleged activities, taken together, demonstrate an ongoing, coordinated effort to perpetuate illegal conduct. Plaintiff has met this standard.

## II. The SAC Complies with Rule 8's "Short and Plain Statement" Requirement.

Defendant's argument that the Plaintiff's SAC fails to comply with Rule 8(a)(2)'s requirement for a "short and plain statement" is entirely misplaced. The purpose of Rule 8 is to provide the adverse party with fair notice of the claim so that they may answer and prepare for trial. Plaintiff has done precisely that.

**A. The Length and Detail of the SAC Are Justified Given the Complexity of the Claims.**

Defendant's suggestion that the SAC is unnecessarily prolix is an attempt to trivialize the scope and importance of Plaintiff's allegations. The SAC spans 95 pages not because of excessive verbiage, but because Plaintiff is asserting claims against a broad array of defendants and addressing a range of serious, interconnected issues, including multiple civil rights violations, systemic corruption, and a sustained pattern of racketeering. Given the nature and complexity of these allegations, it is entirely reasonable that the SAC provides a comprehensive account of the events in question.

Moreover, the SAC is sufficiently clear and organized to provide the defendants with ample notice of the claims. The fact that it contains a variety of allegations involving different entities—ranging from municipal officers to private hospitals—does not render it too vague or burdensome. Rather, it reflects the multifaceted nature of the wrongdoing Plaintiff seeks to address.

**B. The Allegations in the SAC Are Adequate to Meet the Notice Pleading Standard.**

As established in *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988), the purpose of Rule 8 is not to mandate brevity at the cost of clarity, but to ensure that the pleading gives the adverse party fair notice of the claims asserted. Plaintiff has fully complied with this standard. The SAC is plainly written, provides a clear narrative of the events at issue, and includes sufficient factual detail to support each of Plaintiff's legal claims. Defendant's objections on this ground are therefore without merit.

## III. Conclusion:

Defendant's motion to dismiss must be denied in its entirety. Plaintiff has adequately pleaded all of the elements required for his RICO claim, and the Second Amended Complaint provides sufficient detail to meet the notice pleading standards of Rule 8. Defendant's arguments rest on misinterpretations of the law and factual distortions, and their attempt to avoid the serious allegations of criminal conduct should be rejected. This case should proceed to discovery, where Plaintiff can further substantiate the claims of racketeering and civil rights violations that are at the heart of this matter. The Plaintiff's RICO claim and the entirety of the Second Amended Complaint must stand.

---

This counter statement aggressively dismantles Defendant's arguments, pointing out the flaws in their application of legal precedents and showing how Plaintiff has sufficiently met the legal requirements for pleading RICO claims and complying with Rule 8. It emphasizes the complexity of the allegations, rebutting Defendant's claim that the complaint is overly detailed or insufficient.

Page 20

**Plaintiff's Counter Statement:**

Defendant's motion to dismiss on the grounds of a purported failure to comply with Federal Rule of Civil Procedure 8(a)(2) is, at best, a diversionary tactic aimed at sidestepping the substantial and well-founded claims of civil rights violations raised in the Second Amended Complaint (SAC). The Defendant's baseless and sweeping criticisms of the SAC as being "replete with historical digressions, conspiracy theories, and political commentary" are not only irrelevant but demonstrate a fundamental misunderstanding of the nature and scope of Plaintiff's claims. The SAC is clear, organized, and sufficiently detailed to put the Defendants on notice of the serious allegations against them. Rather than providing any meaningful legal rebuttal, Defendant resorts to distraction by improperly dismissing the essential substance of the Plaintiff's claims.

## I. Plaintiff Has Adequately Pleaded the Core Issues and Defendants Are on Fair Notice of the Claims Against Them.

The Defendant's complaint about the SAC containing "political commentary" and "historical digressions" is both a disingenuous and trivial critique. While the Plaintiff has understandably referenced historical

context to underscore the systemic nature of the civil rights violations at issue, these references are far from irrelevant. The historical context, including references to slavery, Reconstruction, and presidential administrations, serves to illustrate the persistent and deeply entrenched patterns of racial discrimination that continue to plague American society. Such references provide critical background to the Plaintiff's claims, demonstrating the broader and ongoing issue of racial injustice that the Plaintiff seeks to address in this case. Defendants cannot reasonably argue that this historical backdrop bears no relevance when it is foundational to understanding the Plaintiff's legal and factual assertions.

Defendant's assertion that the SAC fails to provide fair notice of the claims against them because of its inclusion of references to political figures and historical events is a diversionary tactic. These are not "conspiracy theories" but contextually relevant facts that reflect a pattern of discrimination, particularly where such patterns manifest in governmental and institutional actions. The claim is clearly laid out in the SAC, with factual allegations substantiating the Plaintiff's detention on February 11, 2020, and its racial discriminatory nature. The inclusion of additional context only enriches the narrative and aids in explaining the long-standing and pervasive nature of such civil rights violations.

## II. The SAC Does Not Suffer From Vagueness or Incoherence.

Defendant's claim that the SAC is "vague," "repetitive," and "contradictory" is utterly without merit. While the SAC indeed contains multiple counts, they are not "overlapping" or "identical," as Defendant claims. Rather, the counts correspond to distinct legal theories based on different facets of Plaintiff's experiences, providing a comprehensive account of the various wrongs perpetrated by the Defendants. It is entirely appropriate and legally sound for Plaintiff to set forth several legal theories to cover the various violations of rights that have occurred.

Moreover, the mention of specific dates—such as "October 1-5, 2021," and "August 28, 2021"—is hardly a vague or confusing reference. These dates are referenced to underscore the continuing and ongoing nature of the violations Plaintiff has suffered. Far from being irrelevant, these references reinforce the Plaintiff's claim that the discrimination and wrongful conduct were not isolated incidents but part of a broader, sustained pattern. The inclusion of such details is consistent with the requirements of Rule 8, which allows for a broad, factually detailed pleading, particularly when addressing complex, ongoing civil rights violations.

## III. Plaintiff's Pro Se Status Does Not Excuse Defendants' Burden to Respond to Legitimate Claims.

The Defendant further attempts to sidestep the merits of the Plaintiff's claims by invoking the Plaintiff's pro se status as a reason to dismiss the SAC. However, pro se litigants are entitled to a liberal construction of their pleadings, and courts consistently allow pro se plaintiffs some leeway in pleading. This leeway, however, does not mean that Plaintiff's claims are insufficient; it simply allows Plaintiff's factual allegations to be considered without the same level of formality required for counselled parties. The SAC presents a coherent narrative that sufficiently informs the Defendants of the factual bases for each claim.

Defendants' arguments to the contrary misapply the liberality afforded to pro se litigants and seek to dismiss legitimate claims on procedural grounds.

## IV. Rule 8 Does Not Require a Perfectly Concise Complaint, but Rather One That Provides Fair Notice.

Defendant's criticism that the SAC is not a "short and plain statement" as required by Rule 8 is a misunderstanding of the rule's purpose. As the Second Circuit has held, the purpose of Rule 8 is to provide the adverse party with fair notice of the claims against them, so they may prepare an appropriate response. Plaintiff has clearly provided that notice, with ample factual detail supporting each legal claim.

The Plaintiff's claims are clearly articulated, and each count is sufficiently distinct to provide the Defendants with the ability to understand the specific allegations made against them. Contrary to Defendant's assertion, the SAC is neither overly prolix nor convoluted. The detailed nature of the complaint reflects the gravity of the allegations and the complexity of the legal and factual issues at hand. Defendants are fully capable of responding to these allegations, and the SAC is far from placing an unfair burden on them.

## V. Conclusion:

Defendant's motion to dismiss based on Rule 8 is without merit and should be rejected. The SAC provides a clear, coherent, and well-supported factual and legal basis for each of Plaintiff's claims. The historical context, while expansive, is directly relevant to understanding the systemic nature of the civil rights violations that form the core of this case. Far from being vague or incoherent, the SAC meets the requirements of Rule 8 and provides Defendants with fair notice of the claims they are expected to respond to. Defendant's efforts to obscure the validity of Plaintiff's claims through procedural arguments should not be entertained by this Court. Plaintiff's case is well-pleaded, and the Defendants should be compelled to respond on the merits rather than evade responsibility through baseless procedural motions.

Page 21

**Plaintiff's Counter-Statement:**

Defendants' motion to dismiss based on Rule 8, alleging that the Second Amended Complaint (SAC) is "replete with historical digressions, conspiracy theories, and political commentary," is both a diversionary tactic and an unfounded attempt to avoid the real issues at hand. The accusations made by Defendants completely miss the point, seeking to downplay the gravity of the Plaintiff's claims by focusing on peripheral elements rather than addressing the core allegations of racial discrimination and civil rights violations. This motion is a strategic attempt to confuse the matter by distorting the Plaintiff's legitimate legal arguments into something frivolous. The SAC is neither excessively vague nor irrelevant, but rather it is a detailed, well-founded articulation of serious and systemic issues that require the Court's attention.

# I. The Inclusion of Historical Context is Vital to Understanding the Systemic Nature of the Claims.

Defendants' dismissive characterization of the SAC as "replete with historical digressions" is both misguided and insulting. The historical context provided by the Plaintiff—references to slavery, Reconstruction, and various presidential administrations—is not a deviation from the central factual allegations but an essential element that underscores the deep-seated and continuing racial discrimination that Plaintiff has suffered. The history of racial injustice in this country, particularly its institutionalization and perpetuation by state and private actors, is critical to understanding the broader scope of Plaintiff's claims. Far from being irrelevant, these references demonstrate that the issues at hand are not isolated or trivial but part of a centuries-old pattern of abuse and inequality.

Defendants' attempt to dismiss these references as "conspiracy theories" is a blatant mischaracterization. The Plaintiff is not merely asserting a political narrative or indulging in unsubstantiated claims. The historical context is rooted in undeniable facts and is directly relevant to understanding the larger social, legal, and institutional forces that shape the experiences of racial minorities in America. The Defendant's attempt to downplay this context is an affront to the very nature of the claims Plaintiff is pursuing.

# II. The Allegations Are Clear, Not Vague or Contradictory.

The Defendants' assertion that the SAC contains "repetitive" or "contradictory" allegations is baseless and unsupported. The allegations in the SAC are carefully crafted to illustrate the persistent and systemic nature of the violations Plaintiff has suffered. While the SAC is comprehensive in its account, it is not disorganized or unclear. The references to events occurring on "October 1-5, 2021" and "August 28, 2021," far from being extraneous or irrelevant, serve to illustrate the continuing nature of the discrimination Plaintiff faces. These references highlight that the violations are not isolated incidents but ongoing patterns of behavior, crucial for demonstrating the systemic and long-lasting impact of Defendants' actions.

Additionally, the SAC contains multiple counts not because they are "overlapping" or "identical," but because they address distinct aspects of the discrimination Plaintiff has endured. Each count is an independent legal theory tied to a unique violation of Plaintiff's rights. The fact that these counts may share some factual overlap is a testament to the interconnected nature of the discriminatory conduct at issue, not an indication of confusion or redundancy.

# III. The Allegations are Adequate and Compliant with Rule 8's Requirements.

Plaintiff's Second Amended Complaint more than satisfies the requirements of Rule 8, which mandates that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Defendants are not entitled to demand a complaint so overly simplified that it ignores the complexity of the issues presented. Rule 8 does not require that a complaint be devoid of detail, nor does it call for an oversimplified narrative. The purpose of Rule 8 is to ensure that the Defendant is given fair notice of the Plaintiff's claims. The SAC does just that.

Plaintiff's complaint is not a labyrinth of meaningless allegations but a structured and factual presentation of the specific wrongs committed. Despite Plaintiff's pro se status, which understandably affects the formality of the pleading, the SAC clearly identifies the Defendants, the events of February 11, 2020, the discriminatory conduct, and the legal basis for each claim. Defendants are more than capable of formulating an appropriate response, and any claim to the contrary is a transparent attempt to avoid confronting the substance of the case.

## IV. The Length and Detail of the SAC Reflect the Seriousness of the Claims, Not an Unnecessary Burden.

Defendants also argue that the "sheer volume" of the SAC imposes an "unfair burden." This accusation is a thinly veiled attempt to distract from the merits of Plaintiff's case. The length and detail of the SAC are entirely justified by the gravity of the issues at hand. The Plaintiff has suffered multiple violations of his civil rights, and it is both necessary and proper for the complaint to provide adequate detail to substantiate these claims. The volume of the allegations does not, as Defendant suggests, create an undue burden on the Court or the Defendants; rather, it reflects the complexity of the case and the persistence of the discriminatory actions at issue.

## V. Conclusion:

Defendants' motion to dismiss based on Rule 8 should be summarily denied. The SAC provides a clear, well-supported account of the Plaintiff's claims, grounded in both specific factual allegations and essential historical context. Defendants' attempt to dismiss these allegations as irrelevant political commentary or conspiracy theories is without merit and fails to address the core legal issues. The claims in the SAC are sufficiently detailed to provide Defendants with fair notice, and there is no legal basis to dismiss them on procedural grounds. The Defendants must be compelled to respond to the substance of the Plaintiff's allegations rather than hide behind procedural arguments.

Page 22

**Plaintiff's Counter-Statement:**

Defendants' request to dismiss all claims against the City of New York and individual Defendants—Joseph Angelone, Adam Imperato, William Neville, Michael Rios, and Freddy Tavares—fails to address the substance of the Plaintiff's allegations and offers no justifiable basis for the relief sought. The motion to dismiss is a thinly veiled attempt to evade accountability for their egregious conduct and systemic violations of Plaintiff's civil rights.

The Plaintiff has presented compelling, fact-based allegations supported by both the law and historical context that unequivocally demonstrate racial discrimination and other constitutional violations perpetrated by the Defendants. Rather than addressing these serious allegations, Defendants have resorted

to procedural defenses in an attempt to sidestep the heart of the matter—the blatant denial of the Plaintiff's fundamental rights.

## I. Defendants' Motion is a Transparent Effort to Evade Accountability.

The motion to dismiss all claims with prejudice is fundamentally flawed. Defendants' request is not grounded in any meaningful legal argument but rather seeks to shield them from the very accountability that is owed in this case. Their attempt to dismiss based on technicalities and perceived deficiencies in pleading ignores the powerful, substantive claims presented by the Plaintiff. The alleged actions of the Defendants—rooted in racial animus and discriminatory intent—are far from the mere technical defects Defendants purport them to be. These are serious, actionable claims that demand the Court's full scrutiny and must not be dismissed under the pretext of procedural inconvenience.

## II. Plaintiff's Claims Are Clearly Stated and Legally Sufficient.

Plaintiff's claims are clear, well-founded, and more than sufficient to meet the pleading standards of Rule 8 and beyond. The SAC provides a thorough, articulate account of the violations committed by the Defendants and explains how each defendant's actions were integral to the broader pattern of discriminatory conduct. Rather than presenting vague or conclusory allegations, the Plaintiff has outlined specific, detailed instances of unconstitutional and unlawful behavior that not only demonstrate injury but also warrant full judicial review.

It is evident that the Plaintiff is entitled to relief, and Defendants' attempt to dismiss these claims—under the guise of procedural inadequacies—is an unjust attempt to escape their due responsibility for their actions.

## III. Dismissing the Claims Would Be a Grave Injustice.

If the Court were to grant Defendants' motion to dismiss, it would deny the Plaintiff his rightful day in court to seek justice for the profound wrongs committed against him. Dismissing these claims would not only preclude the Plaintiff from holding the Defendants accountable, but it would also send a message that governmental and law enforcement entities can act with impunity, undeterred by the legal consequences of their actions. The Plaintiff's allegations—rooted in a history of systemic racial discrimination—demand that the Court carefully examine the facts and not allow Defendants to evade their legal responsibility through procedural motions.

## IV. Conclusion:

For all the reasons outlined above, Defendants' motion to dismiss should be denied. The claims against the City of New York and the individual Defendants are legally sound, supported by factual allegations that warrant judicial consideration, and deserve to be fully litigated. The Plaintiff has rightfully asserted his civil rights and should be afforded the opportunity to seek the relief he is due. The Court must reject Defendants' motion and allow this matter to proceed to its rightful resolution.

Respectfully submitted,
[Plaintiff's Counsel]

Page 23